# CHARLESTON.

## STATE *v.* LUKE GRAHAM.

### Submitted May 15, 1923. Decided May 22, 1923.

1. HOMICIDE—*Scope and Admissibility of Dying Declarations Stated.*

   Dying declarations are admissible to prove the fact of the killing, who was the murderer, and such other facts and circumstances as immediately attended the homicide and form part of the res gestae. They may extend to the entire circumstances of the fatal occurrence, but should not include narratives of matters not immediately connected with it. (p. 70).

2. SAME—*Prior Transactions, Not a Part of the Res Gestae, Contained in Dying Declarations Inadmissible.*

   The dying declarant does not become a general witness; and although, were he alive and sworn as a witness in the case he might testify as to prior transactions, separate and distinct from and forming no part of the res gestae, and as prior threats made by the defendant against him, or prior quarrels tending to show defendant's ill-will toward the declarant, yet such statements when contained in a dying declaration are inadmissible upon the trial of the defendant for declarant's death, because such facts are not a part of the res gestae. (p. 70).

3.  SAME—*Instruction Leaving in Doubt Whether Accused May be Found Guilty of Lesser Offense Than Manslaughter or Acquitted Held Erroneous.*

    Upon a trial for murder, where the defense is that the killing was accidental, it is error to give an instruction in the following form: "The court instructs the jury that if they believe from the evidence in this case that deceased came to his death by a pistol shot wound at the hands of the defendant, the presumption is that it is murder in the second degree. If the State would elevate it to murder in the first degree, it must establish the characteristics of that crime; and if the prisoner would reduce it to manslaughter, the burden of proof rests upon the prisoner"; because it leaves the matter in doubt whether the accused may be found guilty of a lesser offense than manslaughter or whether he may be acquitted; there being no other instructions given substantially covering this phase of the case. (p. 72).

4.  PRESUMPTION ON PROOF OF HOMICIDE.

    Point two of the syllabus in *State v. Hobbs*, 37 W. Va., 812, 17 S. E. 380, approved. (p. 72).

Error to Circuit Court, Wyoming County.

Luke Graham was convicted of voluntary manslaughter, and he brings error.

*Reversed and remanded.*

*R. E. Hughes* and *W. S. Thompson*, for plaintiff in error.

*E. T. England*, Attorney General, and *R. A. Blessing*, Assistant Attorney General, for the State.

MEREDITH, JUDGE:

Defendant was convicted of voluntary manslaughter upon an indictment charging him with the murder of John Graham, and was sentenced to the penitentiary for five years. He assigns various errors, but two of which we deem material.

Defendant and the deceased were cousins, about twenty-one years of age, living in the same community in Wyoming County. About 5:30 in the afternoon of May 7, 1921, Lonnie Blankenship, Ellis McKinney, Burdine Reed and John Graham, the deceased, all young men, were lying on the ground on the left-hand side of the road about 130 yards below the store of W. P. McKinney. Defendant Luke Gra-

ham and his brother, Jesse, came down from the store on horseback. They were going fast; defendant was riding a two-year-old colt. They were on their way to Herndon. As they came to the point where the young men were lying, defendant's horse passed some distance before it could be stopped, but as they came by, John Graham holloed, "Hello, Luke." Upon hearing John, they stopped, turned around, and rode back to where Luke and his associates were. The State's witnesses do not agree exactly as to what was there said, but it appears that the deceased asked Luke where he was going and he told deceased he was going to Herndon, and that he was taking his revolver along with him. He then withdrew it from its holster; whereupon, deceased said "I believe I know that gun" or "I owned that gun." To this the defendant replied "No, you don't" or "No, you never, I got this gun off of a punch-board at Rodelland, it hasn't been shot but seven times." He then fired one shot into the ground in the road some four or five feet from where deceased was lying. Whether this was at the instance of the deceased is not clear. This caused defendant's horse to jump. He had the gun in his right hand and on the side next to deceased. As he tried to right or check his horse his gun was discharged a second time. This shot passed through the lower left vest pocket of deceased, entering his body and coming out near his spine. John holloed "Luke, you have shot me, you have killed me. I know you didn't aim to do it; but you have killed me." Luke replied "I surely haven't shot you, Johnnie." Deceased replied "You have shot me, but you done it accidentally." Defendant dismounted, went over to where John lay, drew his coat aside and seeing that John was shot, began to cry. Some one went for a doctor, and defendant put Lonnie Blankenship on his colt and sent him after a minister. Defendant remained there until a minister came. They removed John to the house of W. P. McKinney nearby and the next day he was taken to a hospital at Bluefield, where he died from the wound on May 13th. All the eye-witnesses, and there are quite a number of them, agree that there was no quarrel between the defendant and deceased. Defendant claims that the

shooting was purely accidental. The State claims that it was premeditated, and to show this introduced a purported dying declaration of deceased, made to his sister at the hospital on Tuesday preceding the Friday on which he died. As the main controversy here is over this declaration, we copy her testimony in that respect in full. It reads:

> "He told me—I asked him several times if Luke was mad at him, and he said, 'Nannie, I am going to tell you why he killed me,' he says, 'for fear I leave the impression on you and my folks that I have wronged him secretly.' He said he had come to him twice in the past month, or may be a little longer time, and he asked him to help him make whiskey, and that he refused, and that he cursed him and asked him his reason and that he told him for one reason more than anything in the world, that he didn't want to leave a burden like that on his father and mother, and for another that he had made a resolution in his mind that he would never do a thing like that as long as he lived, and that as long as he had money or whiskey he was willing to give it to him but that he wouldn't help him make it, and that he cursed him and asked him if he thought he was too good to, and he told him no not for that reason, and he said, 'That is why he killed me and isn't it an awful thing for a man to lay down and die over,' and he said, 'That is what I am doing.'"

Defendant objected to the introduction of this statement, but his objection was overruled and he excepted. Some six separate grounds are urged against it, but we deem it necessary to discuss but one. We may assume that a proper foundation was laid for its introduction, though this is denied by defendant's counsel; the real question is whether the declaration, considering it from its nature, is proper evidence. Two objections are pointed out by counsel for defense: (1) because the declaration relates to transactions or occurrences which were separate and distinct from the homicide and in no sense a part of the res gestae; and, (2) that it contains mere conclusions or opinions of deceased. The State relies upon the case of *State* v. *Burnett,* 47 W. Va. 731, 35 S. E. 983; in point two of the syllabus the law is there stated:

> "Dying declarations, being a substitute for sworn testimony, must be such narrative statements as would be admissible had the dying person been sworn as a witness. If they relate to facts to which the declarant could have thus testified, they are admissible. Mere declarations of opinion, which would not be received if the declarant were a witness, are inadmissible."

A careful examination of that case will disclose that the language in the syllabus is broader than the opinion warrants. The declaration as detailed by Judge ENGLISH is:

> "Dr. Brown says, in asking Morris about the shooting, and after locating the place where it occurred, he inquired: 'Do you have any idea who shot you?' He said: 'I do. Of course, I do, but I am not sure. I was shot with Burnett's little rifle, and I think Charley Burnett did the shooting.' I said, 'Why do you think that?' He said, 'Because he has threatened to do it.' Then I asked him if he had seen anyone on the road who he would suspicion of having shot him. He said, 'No.' He had told me of a row he and Mrs. John Hill had had. I says, 'Do you think Mrs. John Hill did it?' He said, 'No, she didn't do it.' I says, 'Do you think John Hill did it?' He says: 'No, sir, neither of them didn't do it. They are mean enough, but they didn't do it. I think Charley Burnett did it.' "

This court held that all of the statement should have been excluded. While the court bases its ruling on the fact that it contains mere declarations of opinion, yet there are also statements of fact. For instance, he says that Charley Burnett had threatened to shoot him, a statement of fact, not mere opinion. Now had the witness been alive, he could as a witness have testified to threats made, even though they were made at a different time and place. The statement in the syllabus that "If they relate to facts to which the declarant could have thus testified, they are admissible," is too sweeping and taken apart from the facts stated in the opinion is inaccurate. This statement would imply that the declarant becomes a general witness and that anything he might say in a dying declaration if he could give it in evidence were he

alive, would be competent evidence upon a trial of the accused for his homicide. This is not the law and never has been in this state. The declarant does not become a general witness, but his dying declarations are confined to such facts and circumstances as immediately attend the homicide and form part of the res gestae. A declaration as to a previous transaction, separate and distinct from the homicide, is not admissible, even though it be a threat made by the defendant against the declarant. 1 Greenleaf, Evidence, §156a, cases cited; Jones, Evidence, §334; *Patterson* v. *Commonwealth,* 114 Va. 807, 75 S. E. 737; *State* v. *Crean,* 43 Mont. 47, 114 Pac. 603; 24 Am. & Eng. Ann. Cas. 424, and notes; *State* v. *Johnson,* 41 R. I. 253, 103 Atl. 741; 14 A. L. R. 754, and annotated cases.

The declaration in this case does not disclose a single fact or circumstance forming a part of the res gestae. It relates wholly to separate and distinct transactions and opinions; not a word as to the time, place, and circumstances of the shooting. The State contends it is admissible to show the state of feeling of the accused toward the deceased; but not so. It can not be received for any purpose as it clearly violates the rule that it must relate facts and circumstances forming part of the res gestae. Other reasons might properly be urged against its admission, but these are sufficient. Its admission was error.

A second ground of error is urged in the admission of the testimony of Walter P. McKinney and George W. McKinney in rebuttal. This evidence should not have been introduced in rebuttal, but as it will probably be presented in the proper order and time on a new trial, we need make no further comment.

A third ground of error relates to certain instructions. State's instruction No. 3, which told the jury that if they believe that deceased came to his death by a pistol shot wound at the hands of the defendant, the presumption is that it is murder in the second degree; if the State would elevate it to murder in the first degree, it must establish the characteristics of that crime; and if the prisoner would reduce it to manslaughter, the burden of proof rests upon the prisoner. This instruction is substantially the same as that given in

*State* v. *Hobbs,* 37 W. Va. 812, 17 S. E. 380.  In that case
the killing was admittedly intentional, but the accused claimed
it was in self-defense.  In that case it is not clear that the
purported copy of the instruction copied in the opinion is
the correct one, as the last page of the opinion shows that
the court gave the instruction in the following language:

> "Where a homicide is proved, the presumption in
> this State is that it is murder of the second degree,
> and the burden is on the State of showing, if she
> can, that it was murder of the first degree; and upon
> the accused, of showing, if he can, that it was with-
> out malice, and therefore only manslaughter, or that
> he acted lawfully, and is therefore not guilty."

This is carried into point two of the syllabus as the law
of the case, and is, we think, correct.  It follows, therefore,
that State's instruction No. 3 should not have been given,
as it assumes that defendant can not be found guilty of a
lesser offense than manslaughter or can not be acquitted.  It
at least leaves the matter in doubt.  We think defendant's
instructions Nos. 6 and 7 were fully covered by others given.

For the foregoing reasons, we reverse the judgment, set
aside the verdict, and award the defendant a new trial.

*Reversed and remanded.*