STATE OF WEST VIRGINIA *v.* WINSTON L. SHELTON

(No. 8063)

Submitted January 29, 1935. Decided February 19, 1935.

*E. G. Pierson* and *W. E. R. Byrne,* for plaintiff in error.

*Homer A. Holt,* Attorney General, and *Kenneth E. Hines,* Assistant Attorney General, for the State.

MAXWELL, JUDGE:

This is a homicide case from Clay County. The result of the trial was the sentence of the defendant, Winston L. Shelton, to penitentiary confinement for fifteen years on a verdict convicting him of second degree murder in the killing of Clemon Rogers.

The tragedy took place on Main Street in the town of Clay about 11 P.M., January 1, 1934. The defendant admits that he fired from a shotgun the charge which fatally wounded the deceased.

The defendant, age 57, a man of family and property, for several years has had imperfect use of his legs because of serious loss of their normal strength. Habitually he walks with a cane, sometimes with crutches. The deceased was a much younger man, weighed 170 pounds or more, and was boastful of his physical prowess. Two witnesses from the vicinity of his home near Paxton in Clay County testified that his general reputation in that community as a peaceable citizen was not good. One of them referred to the deceased's reputation for being "troublesome" and "fussy".

On the night of the fatal event deceased was drunk and

quarrelsome. He was a constable and earlier in the evening was armed with two revolvers, but at the time he was shot he had none on his person.

Of the details of the voluminous record only the salient features will here be recited. The narrated events all occurred on the south side of Main Street. At the eastern or upper end of the range of activities is the Luke Rhodes restaurant; about 350 feet away, at the western or lower end, is the residence and restaurant of the defendant. Westward from the Rhodes restaurant there are first a vacant lot, then, in order, the law office of B. C. Eakle, the Clay County Bank building, an intersecting street, a building with two business rooms occupied by the post office and the Mullens confectionery store, the Henry Clay Hotel, a vacant lot, a garage and service station of the defendant, and his restaurant and residence.

A while before the shooting there was a disturbance in the Rhodes restaurant. Several persons were present. There was much loud and rough talk but no violence. Conspicuous among the contenders were the deceased and Bill Shelton, age 21, likewise intoxicated, son of the defendant. Bill and the deceased had had trouble about two weeks previously. Some say that Rogers (the deceased), coming into the restaurant after the row had started, undertook in his capacity as constable to quell the disturbance; others that he flashed a revolver with loud threats as an active participant. Either in the restaurant or just after leaving it a revolver which Rogers was carrying in his holster was turned over to Buren Stephenson, deputy sheriff, at the latter's request. Whether Rogers had another revolver about his person after that is not clear, but probably he did not.

Mrs. Myrtle Shelton, wife of defendant and mother of Bill, being informed at her home that there was disorder at the Rhodes restaurant and that Bill was present, went there immediately, with Rena Rogers, a house guest, age nineteen, sweetheart of Bill. Finding Bill they started back with him toward the Shelton home accompanied by Buren Stephenson and Burl Freeman. Rogers followed, cursing, reviling and threatening Bill. Mrs. Shelton ran ahead, aroused the de-

fendant from his sleep and informed him of the trouble. The defendant hastily dressed and went out on the sidewalk in front of his garage.

Mrs. Shelton hurried back to the brawl, and interposed herself between Bill and Rogers, the latter of whom had cast his hat, coat and top shirt—stripped for a fight. While the commotion still raged but without any violent acts unless it was the throwing of one or two rocks by Rogers, Bill was induced to go into the Shelton home where he remained. About that time Robert Shelton, seventeen-year-old son of the defendant, came upon the scene. (Robert was jointly indicted with his father for murder of Rogers but has not been put on trial.) Sharp words passed between him and the deceased. The defendant and Robert testify that the latter picked up two stones and by threats compelled the deceased to throw down a stone with which he was threatening to strike the defendant; that thereupon the deceased threw his right hand to his hip as though to draw a revolver, and, with vile language, threatened to kill Robert, who said to Rogers that if that was the game he was proposing to play he (Robert) would get a gun. He immediately went to the nearby home of E. L. Stephenson and obtained the defendant's shotgun which had been borrowed by Stephenson. While Robert was after the gun the deceased went up the street to the Rhodes restaurant; defendant walked a short distance in the same direction.

Robert promptly returned to his father's home with the gun where he loaded it. One shell was discharged in the street in front of the house. He says this was accidental. From this point there is serious divergence in the testimony with respect to the events leading up to and including the shooting.

The testimony of witnesses introduced by the state is to this effect: That Robert gave the defendant the gun near the hotel and said to him, ''You take this gun, you are older and need it''; that after the deceased had returned to the Rhodes restaurant the defendant stopped in front of the post office and in conversation with the postmaster, J. F. Wilson, told him that if he (defendant) had had his gun the matter

would have been settled; that the deceased came back down the street to the corner entrance of the bank building and stood behind a column, and the defendant continuing to stand in front of the post office called deceased a coward and told him to come on; that deceased replied that he was no coward and was not afraid of defendant with all of his guns; that deceased then crossed the intervening side street to the sidewalk corner in front of the post office; that deceased proposed to make friends with defendant and to shake hands with him; that defendant told deceased that he was no friend of defendant and for deceased not to come any nearer; that deceased continued to advance and defendant shot him in the upper third of the left thigh; that after the shot was fired defendant was heard to say, in response to inquiries, ''I shot him in the guts, * * * I killed the damned son of a bitch,'' and that he did not care.

For the defense it is testified that the defendant, while talking with Wilson, heard the report from the gun when it was first discharged, hurried down the street toward his home, met Robert, took the gun away from him to prevent the possibility of the latter's doing something violent, and told Robert to go into the house, but instead Robert went up the street; that the defendant followed, fearing that the deceased might hurt the boy; that when defendant had gone as far as the post office the deceased came from the Rhodes restaurant uttering vile epithets and dire threats against the defendant; that when deceased then started across the side street from the bank and proposed to shake hands, defendant told him that he would shake hands with him when he was sober, but not at the instant; that he (defendant) would not that night take the risk of permitting deceased to come close enough to shake hands; that as deceased advanced, defendant, before he fired, backed away and told him twice not to come any nearer. (That the defendant just before firing moved backward and repeated the command to the deceased not to advance, appears also from the state's evidence.) Defendant testified that he feared violence from the deceased and purposed to shoot him about the knees to stop him.

When the deceased was shot he was still without coat, top shirt or hat.

On the fourth day after receiving the wound, the deceased died thereof in a Charleston hospital.

Points of error urged: (1) sustaining demurrer to plea of former jeopardy; (2) overruling motion to set aside the verdict on the ground that it was contrary to the law and the evidence; (3) undue interference with the order of introduction of defendant's evidence, and improper remarks from the bench; (4) admission in evidence of purported dying declarations of deceased; (5) prejudicial rulings on instructions.

*Plea of former jeopardy.* In the course of the taking of testimony in the initial trial, report having been made to the court that there had been a separation of the jury, routine proceedings were suspended and inquiry was made in the presence of the defendant concerning the basis of the report. On a hearing, the court, being of opinion that there had been such separation as would necessitate setting aside a verdict of guilty if one were returned, declared a mistrial, withdrew a juror, discharged the others and re-set the case for trial the following week. When the case was recalled the plea of former jeopardy was interposed. The state craved oyer of the orders which had been entered in the case and, the same having been read, demurred to the plea, which demurrer the court sustained. The defendant excepted to the ruling of the court on the demurrer, but no objection was made to the manner of procedure. The evidence taken by the court on the question of the separation of the first jury is not in the record before us. We must assume that the evidence was sufficient to warrant the factual finding of the court. Therefore, considering that there was an improper separation, had the defendant been placed in jeopardy, within the meaning of the constitutional provision (West Virginia Constitution, Article III, section 5) which prohibits the placing of a person twice in jeopardy for the same offense? Where the state has once placed a person in peril of life or liberty under accusation of a specific crime, such individual, protected by the constitutional guaranty, may never thereafter be put on trial for the same alleged offense, unless the jeopardy at the first trial was destroyed *ex necessitate*. This is elementary. But in

application of the postulate difficulty arises in determining when there has actually been a ''jeopardy'' within constitutional meaning. A former acquittal on the merits is, of course, a bar to a second prosecution. Code, 61-11-13.

We have another statute, which has existed for many years, that authorizes a trial court to excuse a juror who becomes unable, from any cause, to continue in the discharge of his duty, and to substitute another in his place. Code, 62-3-7. This statute proceeds: ''And in any criminal case the court may discharge the jury, when it appears that they cannot agree in a verdict, or that there is manifest necessity for such discharge.'' The portion of said statute dealing with the substitution of a juror has twice been before this Court. In *State* v. *Davis,* 31 W. Va. 390, 7 S. E. 24, there was upheld the action of the trial court in substituting in a felony trial a new juror for one whose son had died after the trial started. In *State* v. *Williams,* 49 W. Va. 220, 38 S. E. 495, a similar substitution was approved. Though the cause for the trial court's action was not disclosed by the record, this Court assumed that there was good cause.

There seems to be no reported West Virginia case dealing with a situation like the one at bar, but the statute (quoted above) authorizes a judge presiding in a criminal case to discharge the jury where there is ''manifest necessity'' therefor. Where the jury has been separated in such manner that a verdict of guilty could not be upheld, we conclude that there is *manifest necessity* to discharge the jury and begin again. That course will be considered to have terminated an unsubstantial and nugatory trial. When the jury is sworn in a criminal trial jeopardy attaches, but it may be destroyed. A fortuity in the trial may put an end to the jeopardy : the case will then stand as though no trial had been started. This determination is a result of necessity. Authorities differ in their lines of reasoning, but they reach the same conclusion. 1 Bishop on Crim. Law (9th Ed.), sec. 1036; II Wharton's Crim. Pro. (10th Ed.), sec. 1445.

We are of opinion that the trial court's action in sustaining the demurrer to the plea of former jeopardy was plainly right.

The statutory provision above quoted and our interpreta-

tion thereof are in accord with the general authorities on the subject and decided cases in other jurisdictions. 8 Ruling Case Law, p. 153; 16 Corpus Juris, p. 250; 1 Wharton's Crim. Law (12th Ed.), sec. 395; *People* v. *Reagle,* (N. Y.) 60 Barb. 527. Cf. Annotation, 38 A. L. R., p. 717. Analogous: *State* v. *Runyon,* 100 W. Va. 647, 131 S. E. 466.

*Motion to set aside the verdict as contrary to the law and evidence.* This was a dragnet motion under which the verdict should have been set aside by the trial judge if the trial involved error prejudicial to the defendant. But under this heading, we shall give consideration only to the question of malice. Did the evidence disclose malice—essential element of murder?

The conduct of the deceased for several hours prior to the fatal shot was reprehensible in the extreme. Even under the state's version of what happened the moment before the shooting, the defendant was justified in mistrusting the deceased's proposal to shake hands. The fact that the deceased was unarmed at the instant, even if the defendant had that information, does not carry controlling significance in the light of the great superiority of his physical power over that of the defendant. It was but natural that the defendant should desire to avoid the risk of death or great bodily harm that would result from placing himself in the overpowering grasp of a drunken man of superior strength in fighting mood and stripped for action. Defendant testified that he believed the deceased was armed.

But the defendant was on the street with a loaded gun. There is the difficulty. Why hadn't he remained at home or returned there immediately after acquiring the gun? He says he was on the street to protect his boy—possibly a satisfactory explanation if true, but the jury did not accept it. Where there has been intentional use of a deadly weapon in producing the death of another, the jury may infer malice from the act. *State* v. *Panetta,* 85 W. Va. 212, 101 S. E. 360. It was for the jury to say whether the defendant's explanations were sufficient. The finding was unfavorable to the defendant and we must accept it unless prepared to say, as a matter of law, that malice did not appear from the conduct of the de-

fendant. In some cases this Court has made such holding. Illustrative: *State* v. *Cassim*, 112 W. Va. 92, 163 S. E. 769. But we are of opinion that we should not be warranted in making that finding here, though men might well differ as to the proper deduction to be made from the facts.

*Introduction of defendant's testimony and remarks from the court.* Counsel for the defendant, having announced to the court that the defendant would rely on self-defense to justify his killing Rogers, undertook to show that Rogers entered upon a bout of intoxication and boisterous conduct six or eight hours before he was shot, and that such conduct on his part continued to the time of the shooting. Apropos of this line of testimony, the defense offered to prove that between eight and nine o'clock in the evening, Rogers, while riding in an automobile with another man and two women, drew and flourished a revolver and threatened to shoot out of the way an automobile which had driven up to a filling station immediately in front of the one in which he was riding. This offer was objected to by the state. There followed an argument between counsel and a colloquy with the court in the presence of the jury. Counsel for the defense advised the court that they expected to follow up the proffered testimony by showing that Rogers' condition grew worse throughout the evening and "finally resulted in giving rise to the necessity under which Shelton acted when he shot Rogers." The court stated: "The rule in cases of that character is that you show first some necessity that justifies or in any way excuses an offense of that character charged in the indictment, and then these matters may be offered in evidence and, as far as material, they may be introduced to the jury." Counsel for the defendant insisted that to comply with the court's opinion would require the introduction of their testimony "backwards", and would operate to the great disadvantage of the defendant. In the colloquy, the court remarked: "It would only be material if there was a necessity for killing him, because a man that is drunk has the same right to live as a man that is sober." Later, the court stated: "The ruling of the court is that the proper way to try this case is to show some attack or other necessity and then you

can introduce such evidence as bears upon the condition of the deceased at the time of the killing.''

Within reasonable limits, the order of the introduction of testimony is within the discretion of parties in interest. In the instant case it seems that it was logical for the defense to undertake to show the intoxicated condition of the deceased and the line of conduct he was pursuing for several hours prior to his receiving fatal injury. In a judicial inquiry, the presentation of facts in chronological sequence is a very elementary rule to follow, but ordinarily there is none which contributes more forcefully to clarity and perspicuity. We think the defense was within its rights.

And, under the circumstances, the remark of the trial court that ''a man that is drunk has the same right to live as a man that is sober'' probably operated prejudicially to the defendant. The proposition was stated by the learned judge abstractly and without qualification, though, of course, it must be recognized that the right to live is a relative matter which depends on the individual's conduct in respect of the rights of others. If he misconducts himself to the extent of threatening the life of another, his own life may be forfeited. If a man crazed from drink is more apt than a sober man to be dangerous to other people, even to the extent of menacing their lives, he does not have the same right to live as a sober man. Remarks of trial courts with reference to matters of fact which might in any degree influence the verdict are improper. *State* v. *Waters*, 104 W. Va. 433, 437, 140 S. E. 139.

We are of opinion that these matters operated to the injury of the defendant and must be held prejudicial error.

*Admission in evidence- of purported dying declarations.* There were two statements or declarations made by the deceased at the hospital the day preceding his death, at a time when he was expecting soon to die of his injury. The first was dictated by him to a young lady stenographer and bookkeeper employed at the hospital. His dictation was taken by her in shorthand, typewritten and read to him: he signed it. It follows:

''As near as I can tell you, I was in Luke Rhodes' restaurant. A couple of men and 2 girls were in

there. They were all drinking and were arguing over the girl. I, as an officer of the law, asked them to be quiet. One word brought on another and I cannot tell you how it all ended, and the first thing I knew, Wince Shelton shot me. I had no warning that he was going to shoot. This happened at the corner, near the restaurant. No threats were made. There was a lot of noise and cursing, but no fighting. This happened about 11 p.m., January 1, 1934.

C. V. Rogers."

Some hours later, the sheriff of Clay County obtained a statement from the deceased. The sheriff made notes thereof and turned them over to the same stenographer who likewise typewrote this statement and read it to deceased who thereupon signed it. The second reads:

"On the night of January 1, 1934, about 11 p.m., I walked down the street to near the front of the Post Office and Wince Shelton was coming up the street. He cursed me and said to me 'Don't come another step.' And I said, 'Mr. Shelton, I haven't got anything against you or Bill either. I was just trying to get Bill to go home'. And then he shot me. I did not know that he had a gun and I did not have a gun. I had had Buren Stephenson's gun, but gave it to him about two hours before I was shot. I knew Bill was on parole from the Federal Prison and that if I arrested him that he would probably be taken back to finish his sentence. Bill Shelton had been in Luke Rhodes' restaurant earlier in the evening. He seemed to be under the influence of liquor and he had been arguing and cursing and was very noisy.

C. V. Rogers."

The stenographer testified that at the time of these transactions Rogers "seemed to be very rational."

The rule attending the admission in evidence of dying declarations is clearly stated in *State* v. *Graham*, 94 W. Va. 67, 117 S. E. 699, as follows: "Dying declarations are admissible to prove the fact of the killing, who was the murderer (slayer), and such other facts and circumstances as imme-

diately attended the homicide and form part of the *res gestae*. They may extend to the entire circumstances of the fatal occurrence, but should not include narratives of matters not immediately connected with it."

Measured by that rule, and, in the light of our opinion hereinbefore expressed that the defendant was entitled to prove the course of conduct of the deceased for some hours prior to the shooting, we consider that the full statement of the deceased as contained in his first declaration was properly admitted in evidence. The first part of this statement is not clear, but the problem of the intended meaning thereof is for jury determination.

Applying the rule of the *Graham* case to the second declaration, is must be held to be partly proper and partly improper. The first half of the statement ending with the sentence, "I did not know that he had a gun and I did not have a gun" was properly admitted. But the residue of the statement, being merely a narrative of extraneous matters, was not a part of the *res gestae* and bore no pertinency to the shooting. This portion should have been excluded. The narration that Bill Shelton (son of defendant) was under parole from a Federal prison at the time of the events here under inquiry had no possible relevancy to the issue. Its effect was to discredit Bill before the jury, and to burden the defendant with the fact that his son was under conviction of crime. The admission of this part of the second statement was prejudicial to the rights of the defendant.

*Instructions.* The giving of state's instructions Nos. 7 and 8 is pointed out by the defendant as harmful error. No. 7 involves the proposition of a seeking by the defendant of the deceased with the intention of provoking a difficulty, for the purpose of killing him, "and that a difficulty did ensue after the said Shelton had found the said Rogers standing peaceably along a public street," and that in that situation the defendant cannot, without some proof of a voluntary change of conduct or action on his part, avail himself of the plea of self-defense. The defendant's objection is that the evidence does not warrant the hypothesis that Shelton found Rogers

standing peaceably on the street. The objection is well taken.

The attitude of the deceased for a considerable portion of the evening was anything but peaceable. We find no testimony which warrants the deduction that the defendant found the deceased peaceably standing. State's witness, J. F. Wilson, testified that while he and defendant were standing on the sidewalk in front of the post office, the deceased came back down the street "talking loud". This witness was in the best position of any disinterested person to observe what happened at this juncture. No other witness contradicts this statement. It must be accepted as true.

The predication in the instruction with reference to the defendant's finding the deceased standing peaceably on the street is a vital part of the instruction. Such statement being a wholly unwarranted hypothesis, it follows that the entire instruction falls. It involved error prejudicial to the defendant. An instruction should not be given which is based wholly or in material part on a hypothesis not supported by appreciable evidence. *State* v. *Donahue,* 79 W. Va. 260, 90 S. E. 834. Cf. *State* v. *Barker,* 92 W. Va. 583, 115 S. E. 421; *State* v. *Lutz,* 85 W. Va. 330, 345, 101 S. E. 434.

The purport of state's instruction No. 8 was to inform the jury that where, in a homicide case, the use of a deadly weapon is proved and the defendant relies on self-defense to excuse him for the use of the weapon, the burden of showing that he used the weapon defensively is on the defendant, and to avail him, the facts and circumstances showing such defense must be established by a preponderance of the whole evidence. The instruction employs the awkward phraseology "he must prove such defense by a preponderance of the evidence, that for the state as well as that for the defendant." Though the expression is imperfect, we think that the meaning is not perverted. However, on re-trial, this difficulty should be eliminated.

Defendant complains of the refusal of the court to give to the jury his instruction No. 3. Its purpose was to inform the jury that they should view the shooting in the light of the circumstances which attended the defendant at the time. This proposition was included in the defendant's instruction

No. 2, given by the court to the jury. There was no error in the refusal of No. 3.

Because of the errors hereinabove pointed out, we reverse the judgment of the trial court, set aside the verdict, and award the defendant a new trial.

*Judgment reversed; verdict set aside; new trial awarded.*