647 S.E.2d 834

**STATE of West Virginia Plaintiff Below, Appellee**

v.

**Gerald THOMPSON, Jr., Defendant Below, Appellant.**

**No. 33097.**

Supreme Court of Appeals of West Virginia.

Submitted Feb. 27, 2007.

Decided May 15, 2007.

Darrell V. McGraw, Jr., Attorney General, Robert D. Goldberg, Assistant Attorney General, Charleston, for Appellee.

Jerome R. Novobilski, Esq., Clay, for Appellant.

STARCHER, J.

The appellant was tried before a jury and convicted of operating a clandestine drug laboratory. The circuit court of Clay County by order dated October 28, 2005, sentenced the appellant to confinement in the penitentiary for a period of not less than two nor more than ten years. The appellant is appealing his conviction and sentencing.

The appellant claims in his petition for appeal that the statute under which he was convicted is unconstitutional, that the court's questioning of witnesses tended to prejudice the jury, that reversible error occurred during the jury selection process, and that there was juror misconduct.

For the reasons set forth below, we reverse the circuit court and remand this case for a new trial.

I.

*Facts & Background*

On April 13, 2004, the state police and sheriff deputies arrived at the residence of the appellant's mother, Jesse Kay Thompson. The officers were responding to a 911 call reporting gun shots being fired on Ms. Thompson's property. When the officers arrived they were advised that the appellant had been discharging a gun near the Thompson residence. The appellant, Gerald Mark Thompson, Jr., was not present when the officers arrived.

The appellant lived in a two-story cellar house located on his mother's property just behind her house. In order to make sure Ms. Thompson's residence was safe, the officers searched for the appellant in her house and in the appellant's cellar house residence. During the search for the appellant in his cellar house residence, the officers discovered a small wooden barrel containing a small sealed Mason jar with a length of clear tubing extending out of the jar through a seal. The officers also claimed to have seen chemicals inside the jar.[1]

---

1. Items observed by the officers include the following:
    a. One jar contained a blueish looking liquid. One jar contained a white substance. One jar contained a liquid and base.
    b. A jar with rubber hoses attached to the top and with a liquid with rock salt inside.
    c. A shoe box of matches, a rubber hose, a can of Coleman fuel.
    d. Coffee filters.
    e. Two "recipes for making methamphetime."
    f. Rubber gloves, a ball point pen, and razors.

Samples of the materials seized which were believed to be chemicals were sent to the state police crime lab for forensic testing.

On April 21, 2004, the appellant was arrested. The appellant signed a *Miranda* rights form and gave the officers a statement.[2]

On March 22, 2005, the Grand Jury of Clay County returned an indictment charging the appellant with one count of "... possess[ion] with intent to deliver Marijuana, a Schedule 1 controlled substance" and one count of "operate[ing] or attempt[ing] to operate a clandestine drug laboratory."

On August 27, 2005, an order was entered dismissing the charge of "... possess[ion] with intent to deliver Marijuana, a Schedule 1 controlled substance." On August 30, 2005, the trial on the "operat[ing] or attempt[ing] to operate clandestine a drug laboratory" charge was commenced.

During the course of the trial the judge personally conducted extensive questioning of many of the witnesses. In all the judge asked approximately 180 questions of witnesses appearing at trial.

The trial concluded with a verdict of guilty on September 1, 2005.

2. Following is the statement given by the appellant to the officers:

STATEMENT
Date: 04–21–04
Time: 1636(AM)(*PM*) (EST)(DST)
Place: Nicholas County Court House
My name is *Gerald Mark Thompson* and I am *26* years of age.
I reside at Nile Road Nicholas County WV
I have been advised of the rights guaranteed me by the laws and Constitution of this State and of the United States and have signed the attached waiver to that effect. Fully understanding that this statement must be of my own free will without any promise of reward or leniency and without my being threatened or mistreated in any way, I am aware that it can and will be used against me in a criminal prosecution. Nevertheless, I do state the following:
Q. Was that your meth lab we found at your house on Reed Fork Road?
A. Yes
Q. When was the last time you cooked Meth with that Lab?
A. About a month ago I cooked Meth in different places.

## II.

### *Standard of Review*

■ We held in part in Syllabus Point 1 of *State v. Farmer*, 200 W.Va. 507, 490 S.E.2d 326 (1997) that:

... This Court will review a trial court's questioning a witness under the abuse of discretion standard. To the extent the issue involves an interpretation of the Rule 614(b) as a matter of law, however, our review is plenary and de novo.

■ We also held in Syllabus Point 4 of *State v. England*, 180 W.Va. 342, 376 S.E.2d 548 (1988) that:

The plain error doctrine contained in Rule 30 and Rule 52(b) of the West Virginia Rules of Criminal Procedure is identical. It enables this Court to take notice of error, including instructional error occurring during the proceedings, even though such error was not brought to the attention of the trial court. However, the doctrine is to be used sparingly and only in those circumstances where substantial rights are affected, or the truth-finding process is substantially impaired, or a miscarriage of justice would otherwise result.

Q. What did you cook Meth for?
A. I used it.
Q. Where was the last place that you cooked meth at?
A. Up Reed Fork Road but it wasn't in the house.
Q. Do you have a certain spot that you go up Reed Fork to cook meth?
A. No I just pick a spot in the woods anywhere and I would cook it.
Q. Did you sell to anyone else?
A. I did not sell to anyone else.
Q. Was the marijuana that was planted in the house yours?
A. Yes.
Q. How many plants did you expect to get from what you planted?
A. I didn't know. I did know that one of them was growing.
Q. How many batches did you cook of meth?
A. Maybe 3 or 4 batches.
Q. How much meth did you get from a cook?
A. Probably a couple 8 balls it just depends on how much you put in.
Date: 04/21/04
Signed: Gerald M. Thompson Jr.
Witness: Tpr. R.E. Stevenson

With these standards in mind, we proceed to determine whether the trial court committed reversible error.

## III.

### Discussion

We begin our analysis with consideration of the appellant's assignment of error that "the trial court erred in making inquiries of testifying witnesses that tended to prejudice the jury against the defendant through the substance and form of the questions as well as by the tenor and tone of the questions."

Before addressing this specific issue we first examine the proper scope of our analysis.

In *Alexander ex rel. Ramsey v. Willard*, 208 W.Va. 736, 542 S.E.2d 899 (2000) (*per curiam*) we recognized that in order to resolve an allegation of prejudicial conduct by a trial court, a reviewing court is obligated to evaluate the entire record. We said:

> Where an allegation is forwarded that trial court conduct prejudiced the rights of a party to presentation of its evidence and jeopardized the impartiality of the jury, a reviewing court is obligated to evaluate "the entire record and attempt to determine whether the conduct of the trial has been such that the jurors have been impressed with the trial judge's partiality to one side to the point that this became a factor in the determination of the jury." *United States v. Valenti*, 60 F.3d 941, 946 (2d Cir.1995) (*quoting United States v. Guglielmini*, 384 F.2d 602, 605 (2d Cir.1967), *cert. denied*, 400 U.S. 820, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970))."

*Alexander*, 208 W.Va. at 743, 542 S.E.2d at 907.

While the analysis in *Guglielmini, supra*, qualified the review of the entire record to circumstances " ... where there is any substance to such a claim" of prejudicial conduct by the trial court, we believe that the better practice is to review the entire record in all cases in which the appellant on appeal asserts such prejudicial conduct. In following this practice we can be assured that all parties receive the benefit of a fair trial before an impartial judge and jury.

We therefore hold that where a defendant on appeal in a criminal case asserts that a trial court's questioning of witnesses and comments prejudiced the defendant's right to present evidence and jeopardized the impartiality of the jury, this Court upon review will evaluate the entire record to determine whether the conduct of the trial has been such that jurors have been impressed with the trial judge's partiality to one side to the point that the judge's partiality became a factor in the determination of the jury so that the defendant did not receive a fair trial. We now examine the record as it relates to the court's participation in the trial of the appellant by this standard.

The State's first witness was Trooper Richard Stevenson. After examination by counsel, the judge propounded approximately eighty-three questions of Trooper Stevenson. The questioning included details surrounding the crime scene investigation, details surrounding police procedures for collecting and testing chemicals, details regarding the chain of custody of various exhibits, details surrounding photographs taken at the crime scene, and details regarding the statement taken from the appellant. The questioning covered much of the testimony previously covered by the prosecuting attorney on direct examination.

Additionally, the judge, during his questioning of Trooper Stevenson, referred to the evidence seized by the police officers as if the judge had concluded that the seized evidence constituted a meth lab. Such conclusions, of course, are ultimately matters for jury determination. In this regard we observe that the record reflects that no methamphetamine was seized or introduced into evidence.

Specifically, the following questions to Trooper Stevenson relate to the judge's apparent conclusions that the items seized constituted a "meth lab":

> JUDGE: Now, does Lt. Goff have training on handling hazardous waste and *meth labs like this?*
>
> STEVENSON: Yes sir.
>
> . . .

JUDGE: Now, in regard to this matter, I note that you said Lt. Goff destroyed the *methamphetamine*, other than some samples, is that right?

STEVENSON: Yea, he destroyed all, all this liquid stuff contained within the mason jars, and such.

. . .

JUDGE: OK. Now, Lt. Goff, took up this *meth*, and gave you samples. Did he give them directly to you?

STEVENSON: Yes sir.

. . .

JUDGE: Now, I note that you say that the *meth lab* was not active at the time you responded to the scene, is that correct?

STEVENSON: Yes sir.

JUDGE: Did . . . strike that. Was there any indication when you arrived upon the scene that this *meth lab* had been operated?

STEVENSON: Had been?

JUDGE: Had been.

STEVENSON: In the past?

JUDGE: Yes.

STEVENSON: Yes sir.

(Emphasis added.)

Finally, we observe from the record that during the testimony of Trooper Stevenson and after objection by the defendant's counsel, the court prompted the prosecuting attorney on several occasions as to how to successfully introduce evidence. For example, after a motion by the prosecuting attorney to introduce photographs, defense counsel objected based upon a lack of foundation. In responding to the objection the judge stated:

JUDGE: Regard to this matter, Mr. Samples [prosecuting attorney], you may want to inquire of the witness as to April 13th, 2004, whether those exhibits clearly and accurately depict the scene on that date and time if he knows.

SAMPLES: Thank you. . . .

The record shows that the prosecuting attorney proceeded to follow the judge's specific advice.

While attempting to introduce the statement of the defendant, and at what appears from the record to be a bench conference, the judge also stated:

JUDGE: It appears to me too, that the State needs to lay some kind of foundation as to threatening, coercion, or intimidation, and voluntariness of statement, before he gave the statement.

The record further shows that the prosecuting attorney proceeded to follow the judge's specific advice. The judge continued to prompt the prosecuting attorney after additional objection by defense counsel as to the lack of foundation for the defendant's statement. The judge stated:

JUDGE: Appears to me Mr. Samples, you may have to inquire of the witness as to how he knows who signed that document.

And the prosecuting attorney, again, followed the judge's advice.

Additionally while attempting to admit photographs a second time, and after objection by defense counsel for lack of foundation, at what appears to be a bench conference, the judge continued to give advice to the prosecuting attorney:

JUDGE: . . . Well, I . . . I think, think counsel [prosecuting attorney] needs to . . . inquire who took the photos', and were they correctly and accurately depict the scene, the time of taking the photograph. OK.

The prosecutor, again, followed the judge's advice.

The next witness for the State to whom the judge propounded questions was Lieutenant Michael Lowell Goff. The judge asked twenty questions of Lieutenant Goff. The judge's questions to Lieutenant Goff included questions relating to his professional qualifications as a chemist, his investigation experience, laboratory testing practices, his investigation of the crime scene, and his opinion regarding his investigation in this case, all questions that would normally be asked by the attorney who was offering the witness as an expert.

The appellant specifically complains about the following questioning propounded to Lieutenant Goff:

JUDGE: Now, I note that Exhibit 3A and 3B are recipes, so to speak.

GOFF: Yes sir, list of ingredients that sort of . . .

JUDGE: Now, I *assume* those recipes aren't for making a cake.

GOFF: That's correct sir. Not a cake I'd want to eat.

JUDGE: So, those recipes are consistent for making what?

GOFF: The items listed are consistent with one of the, the recipes for manufacturing methamphetamine.

JUDGE: And anybody that possessed that wouldn't have any other reason to possess it, other than the information to make meth?

GOFF: I know of no other reason to have a list of anything involving the ingredients together, no.

. . .

JUDGE: Officer this defendant is charged with operating, or attempting to operate a clandestine drug laboratory. Now bases [SIC] upon the information that you have before you, based upon your investigation, based upon the knowledge of the *confession* that the defendant, gave the police officers, and based upon your experience, training, and knowledge. Is it your opinion that there was a laboratory either being attempted to be operated, or operated in that scene?

GOFF: Yes, sir, I do.

JEROME [defense counsel]: Objection, your honor.

JUDGE: I'll note your objection.

JEROME: Ultimate issue question.

(Emphasis added.)

The judge continued his active participation in the questioning of witnesses when the defendant's witnesses were called to testify. The first defense witness to whom the judge propounded questions was Kermit Sanford, father of the appellant's wife. The judge asked Mr. Sanford the following questions:

JUDGE: Mr. Sanford, you love your daughter, don't you?

SANFORD: Yes sir.

JUDGE: And, I assume that you have feelings for Gerald Thompson, Jr.?

SANFORD: Yes sir.

JUDGE: He's married to your daughter.

SANFORD: Yes sir.

JUDGE: You don't want to see anything happen bad to Mr. Thompson?

SANFORD: Well no.

JUDGE: Likewise, you don't want to see anything happen bad to your daughter?

SANFORD: No.

JUDGE: Now, you saw the photographs here of the residence of Mr. Thompson, didn't you?

SANFORD: Yes sir.

JUDGE: And you saw those items there.

SANFORD: In the ph . . . in the photographs I did.

JUDGE: And you're telling this Court that none of those items were that morning?

SANFORD: No sir, I never seen those items.

JUDGE: Under penalty of perjury and false swearing, you're telling . . .

SANFORD: I'm telling the truth. I'll take a polygraph sir.

JUDGE: Well, I'm the one talking here sir, not you.

SANFORD: Yes sir.

JUDGE: And, you're telling the Court that is the truth?

SANFORD: Yes sir.

The next defense witness was Jesse Kay Thompson, the appellant's mother. The judge propounded forty-seven questions to Ms. Thompson. The questions asked of Ms. Thompson included primarily questions relating details of the circumstances leading up to the call to 911. The questioning was as follows:

JUDGE: Ma'am, how far is your house from the cellar house?

JESSE: Um, probably from here to that wall, may . . . maybe not quite that far.

JUDGE: Which wall, the Courtroom wall back there?

JESSE: Um, it's probably not that far.

JUDGE: So it's shorter than from here to the end where the windows are?

JESSE: Oh, yes, yea.

JUDGE: And where was this fight occurring between your son and his girlfriend?

JESSE: Out in the yard.

JUDGE: Between your house and his house?

JESSE: Yea, on, on, yea, right there in the drive.

JUDGE: OK. How far were you from the fight?

JESSE: I was in the house when they . . . when it started?

JUDGE: Did you go outside?

JESSE: Yes.

JUDGE: And how far did you get, or how close rather did you get to your son and his girlfriend?

JESSE: Well, it was closer than from me to you.

JUDGE: OK. And, could you hear them talking?

JESSE: They was just hollering at each other.

JUDGE: But, could you hear it?

JESSE: Oh yea.

JUDGE: What were they saying?

JESSE: I don't remember what they was sayin'. Can't remember that, I know they was just hollering. And when I went out there, I told 'em to be still, shut up. I didn't want to hear it.

JUDGE: Don't remember anything they were saying?

JESSE: Kristi his girlfriend was in the car, she was sittin' in the car.

JUDGE: Well, could you hear her?

JESSE: I couldn't hear nothing she was saying. She was just . . .

JUDGE: You just earlier said . . .

JESSE: . . . she was uh, crying.

JUDGE: Well, what was the fight about?

JESSE: They didn't have to have anything to get in a fight over, it just, I don't know. You know how girlfriend—boyfriend is . . .

JUDGE: . . . No, I don't know that. No.

JESSE: They'd just get in argument over nothing really . . .

JUDGE: . . . you want this jury . . .

JESSE: She'd want . . .

JUDGE: . . . to believe that they just like to fight . . .

JESSE: Well . . .

JUDGE: And it wasn't anything they were fighting over that day.

JESSE: She want . . . she want him to go down the road, he'd want to stay there and work. She want to go to her friends, and he wouldn't want to go. Or, he want to go get a pack of cigarets, she didn't want to go, just, stuff like that.

JUDGE: I'm talking about on the day, April 13th, 2004, the day of this altercation, and this fight. What were they fighting about?

JESSE: All I know is, she was in the car, and, that's all I know. She was in the car crying, and he was hollering at her . . .

JUDGE: . . . well, what was the yelling about?

JESSE: She was going to leave.

JUDGE: What was he yelling at her? What was he saying?

JESSE: He was telling her to go. Then she said, she was, he said, she was gonna go, then she didn't want to go, and he told her to leave, and she didn't want to leave. That's what they was a hollering over. She . . . he was telling her to leave, and she was crying, she didn't want to leave, and then she was gonna leave, and he told her not to leave, so. Uh, that's all I know it was about.

JUDGE: Did she threaten your son?

JESSE: Not that I know of.

JUDGE: Did your son threaten her?

JESSE: I didn't hear him threaten her, no.

JUDGE: Did your son threaten you?

JESSE: No, he wouldn't hurt me.

JUDGE: Did your son's girlfriend threaten you?

JESSE: No.

JUDGE: Well, then why did your son get a gun?

JESSE: He was just mad, just shootin', thought he'd scare her, I guess.

JUDGE: Where did he shoot?

JESSE: I wasn't out there when he shot. He was sho ... he shot the gun before I got out there. Before I got outside, as well as I can remember. He would, and then he might of shot one time maybe after I got outside. One or two times. He was ....

JUDGE: ... do you remember testifying hearing ...

JESSE: It was dust, dark, that he shot a couple of times.

JUDGE: Do you remember testifying at a hearing in this Court, before this Court, August 8th, 2005?

JESSE: That he shot a couple 2 or 3 times.

JUDGE: And you saw that?

JESSE: After I got outside. He shot maybe once, before I got outside. Then he shot a couple of times after ...

JUDGE: Well, which was it, you're telling this jury first now, that you were inside when he shot, and so you didn't see him shoot. Now, you're saying ...

JESSE: ... No, I said ...

JUDGE: ... other.

JESSE: OK, pardon.

JUDGE: No, no, I'm talking right now.

JESSE: OK, you talk to me, you tell me.

JESSE: OK.

JUDGE: You see there's a procedure here, I get to ask the questions, you get to answer them ok.

JESSE: OK?

JUDGE: And, the situation is Ma'am, do you want this jury to believe now, that the shots were all fired when you were inside the house?

JESSE: No. He fired maybe once or twice before I got outside, that's why ...

JUDGE: Do you want me ...

JESSE: ... when they was hollering.

JUDGE: Do you want me to have the Court Reporter play back

. . .

JESSE: I know what I said.

JUDGE: Your response first.

JESSE: I know what I said. Then after I got outside, he shot a couple of more times.

JUDGE: So, what you testified to on August 8th, 2005, that you saw him shoot ...

JESSE: ... a couple of times.

JUDGE: When your presence was correct then?

JESSE: Yes, it was.

JUDGE: Did he say anything when he fired a gun on that date? Did he say anything at all?

JESSE: He just told me to be still, and quit hollering at him.

JUDGE: Where did he shoot and what direction?

JESSE: I'm not sure if he shot up in the air, or, or in the hill, or which way.

JUDGE: Well, you said, you just testified you were personally present when two shots were fired. He had a gun ...

JESSE: Yea.

JUDGE: ... they were arguing.

JESSE: ... Uh huh.

JUDGE: Weren't you concerned?

JESSE: Well, I knew he wasn't gonna hurt me or her.

JUDGE: You weren't watching what direction the gun was being aimed?

JESSE: No, cause I was hollering at him, telling him to be still. He was telling me to shut up, I turned and he shot a couple of times, and I'll come in the ho ... I told him I was gonna call the police, and I went to come to the house.

The next defense witness to whom the judge propounded questions was Kristin Thompson, wife of the appellant. The judge propounded thirteen questions which focused on the events leading up to the 911 call for the police, including the fight between the appellant and his wife and the gun shots fired.

Finally, the appellant testified. After cross examination of the appellant, the judge propounded the following questions:

JUDGE: Mr. Thompson you were taken before Magistrate Jeffrey Boggs on April 14th, 2004 for arraignment do you remember that?

MARTY: Yes, sir.

JUDGE: Did you ever indicate to Magistrate Boggs uh, that the Police Officers had threatened you in some way?

MARTY: No sir, I was scared to.

JUDGE: You were brought before the circuit court for arraignment after indictment and you appeared before the court on numerous occasions for hearings since that time, do you recall all of those?

MARTY: Yes, sir.

JUDGE: And uh, did you ever mention to the circuit court, any of these issues until today?

MARTY: No, sir, I was scared and I'm scared now. I don't know what's gonna happen when I get out of here, if I do.

JUDGE: Well why would Trooper Stevenson and Trooper Bailey, risk losing their jobs and risk their livelihood, just to get a confession from you?

MARTY: I have no idea.

JUDGE: No matter what happens in a case it doesn't affect those officers does it?

MARTY: No. I don't know they just acted like they were mad at me or something, I don't know. I have never done anything to either one of them.

JUDGE: You would agree, you would have more to lose in this case than the Troopers do.

MARTY: Yes, sir.

The calling and interrogation of witnesses by the court is governed by Rule 614 of the *West Virginia Rules of Evidence.* Rule 614(b) states:

(b) *Interrogation by Court.* The court may interrogate witnesses, whether called by itself or by a party, but in jury trials the court's interrogation shall be impartial so as not to prejudice the parties.

The law relating to judicial questioning of witnesses is also grounded in the fundamen-

tal concepts of our system of jurisprudence. The Preamble to the *West Virginia Code of Judicial Conduct,* in part, states:

Our legal system is based on the principle that an *independent, fair,* and competent judiciary will interpret and apply the laws that govern us. The role of the judiciary is central to American concepts of justice and the rule of law. Intrinsic to all sections of this Code are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to enhance and maintain confidence in our legal system. The judge is an arbiter of facts and law for the resolution of disputes and a highly visible symbol of government under the rule of law....

(Emphasis added.)

Furthermore, Canon 2A, *West Virginia Code of Judicial Conduct,* provides that:

A judge shall respect and comply with the law, shall avoid impropriety and the appearance of impropriety in all of the judge's activities, and shall act at all times in a manner that promotes public confidence in the integrity and *impartiality* of the judiciary.

(Emphasis added.)

Canon 3B(5), *West Virginia Code of Judicial Conduct,* states:

A judge shall perform judicial duties *without bias or prejudice.* A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation, or socioeconomic status, and shall not permit staff, court officials and others subject to the judge's direction and control to do so.[3]

(Emphasis added.)

In Syllabus Point 1 of *State v. Farmer,* 200 W.Va. 507, 490 S.E.2d 326 (1997) this Court held, in part, that:

Commentary.—A judge must perform judicial duties impartially and fairly. A judge who manifests bias on any basis in a proceeding

3. *See also* the commentary to this provision which states as follows:

A trial court must exercise its sound discretion when questioning a witness pursuant to Rule 614(b) of the West Virginia Rules of Evidence....

And in Syllabus Point 3 of *State v. Farmer,* 200 W.Va. 507, 490 S.E.2d 326 (1997) we held:

The plain language of Rule 614(b) of the West Virginia Rules of Evidence authorizes trial courts to question witnesses—provided that such questioning is done in an impartial manner so as to not prejudice the parties.

In Syllabus Point 4 of *State v. Burton,* 163 W.Va. 40, 254 S.E.2d 129 (1979) we held:

A trial judge in a criminal case has a right to control the orderly process of a trial and may intervene into the trial process for such purpose, so long as such intervention does not operate to prejudice the defendant's case. With regard to evidence bearing on any material issue, including the credibility of witnesses, the trial judge should not intimate any opinion, as these matters are within the exclusive province of the jury.

This Court has on multiple occasions spoken to the issue of whether or not a trial judge's participation in a trial before jury was sufficient to prejudice a party. *See Dye v. Rathbone,* 102 W.Va. 386, 135 S.E. 274 (1926) (Syllabus by the Court) ("The judge of the court when engaged in the trial of a case before a jury should studiously abstain from indicating by word, gesture or otherwise his personal views upon the weight of the evidence, or the credibility or incredibility of the witnesses, or the extent of the damages sued for, thereby to invade the province of the jurors, the proper triers of the facts."); *Nash v. Fidelity–Phenix Fire Ins. Co.,* 106 W.Va. 672, 679, 146 S.E. 726, 728 (1929) ("We are of the opinion that the extended examination of the witness by the trial judge was error.... The trial court should be careful not to indicate by word or action his impressions or conclusions of fact which are peculiarly within the sole province of the jury."); *State v.*

*Shelton,* 116 W.Va. 75, 178 S.E. 633 (1935) (Syllabus Point 4, "Remarks of trial courts with reference to matters of fact which might in any degree influence the verdict are improper." The court in a murder case had made the following statement before a jury: "It [intoxication of the victim] would only be material if there was a necessity for killing him, because a man that is drunk has the same right to live as a man that is sober." *Shelton,* 116 W.Va. at 79, 178 S.E. at 637.); *State v. Preece,* 116 W.Va. 176, 187, 179 S.E. 524, 529 (1935) ("Here, however, we cannot escape the conclusion that the questions of the trial judge betrayed to the jury certain deductions that he had made from the testimony, and that these deductions were plainly adverse to the defendant. They were therefore questions that should not have been asked by the court." The court asked sixteen questions of the defendant who claimed she acted in self-defense.); and *State v. Sandler,* 175 W.Va. 572, 576, 336 S.E.2d 535, 539 (1985) ("The obvious prejudice to the defendant was compounded when the court assumed the role of prosecuting attorney and conducted a lengthy examination of the witness.")("... A judge may ask questions for the purpose of clearing up points that seem obscure, and supplying omissions which the interest of justice demands, but it is not proper that he conduct an extended examination of any witness." *Nash, supra,* 106 W.Va. 672, 679, 146 S.E. 726, 728 (citations omitted)).

More recently we have decided cases involving judicial questioning of witnesses in which we looked with disfavor upon extended judicial examination of witnesses. In *Alexander ex rel. Ramsey v. Willard,* 208 W.Va. 736, 542 S.E.2d 899 (2000) (*per curiam* ), the court asked over thirty questions of a party. *Quoting* from *Nash v. Fidelity–Phenix Fire Ins. Co.,* 106 W.Va. 672, 146 S.E. 726, (1929), we stated in *Alexander* that:

Thus, in defining the role of a judge in interrogating a witness, Rule 614 permits the judge to ask questions to prevent mis-

---

impairs the fairness of the proceeding and brings the judiciary into disrepute. Facial expression and body language, in addition to oral communication, can give to parties or lawyers

in the proceeding, jurors, the media, and others an appearance of judicial bias. A judge must be alert to avoid behavior that may be perceived as prejudicial.

understanding, but extended examination of any witness has not been favored.... "[a] judge may ask questions for the purpose of clearing up points that seem obscure, and supplying omissions which the interest of justice demands, but it is not proper that he conduct an extended examination of any witness." *Id.* at 679, 146 S.E. at 728.

*Alexander* at 208 W.Va. at 742, 542 S.E.2d at 905.

We also find the following statement in *Sharpton v. State*, 1 Ga.App. 542, 57 S.E. 929 (1907), instructive:

It is almost an intellectual impossibility for a judge to engage in an examination of a witness on vital questions of the case on trial without in some manner and to some extent indicating his own opinion. Every practitioner knows how eagerly alert jurors are to every utterance from the bench, and how sensitive is the mind of the juror to the slightest judicial expression.

Finally, we observe that these principles have been discussed in 1 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 6–14(A)(1), at 6–228 (4th ed.2000), wherein it is stated:

A criminal defendant is entitled to an impartial and neutral judge in both jury and nonjury trials. If a judge's conduct exceeds this impartiality limitation imposed by the Sixth Amendment, that alone should constitute reversible error.

■■■ We agree with the principles outlined above and, therefore, we hold that a criminal defendant is entitled to an impartial and neutral judge. In a criminal trial, when a judge's conduct in questioning witnesses or making comments evidences a lack of impartiality and neutrality, or when a judge otherwise discloses that the judge has abandoned his role of impartiality and neutrality as imposed by the Sixth Amendment of the United States Constitution, we will reverse and remand the case for a new trial.

The second issue that we address is whether this Court should apply the "plain error doctrine" in this case. At trial, appellant's counsel failed to raise any objection to the trial court's approximately eighty-three questions of complaining officer Trooper Stevenson, nor did he raise any objection to many of the judge's twenty questions of Lieutenant Goff. Defense counsel also failed to object to the judge's ten questions of defense witness Sanford, forty-seven questions of the appellant's mother Ms. Thompson, thirteen questions of the appellant's wife, Kristin Thompson, and seven questions to the appellant. On appeal, sadly, defense counsel only cited two examples of the judge's extensive examination of witnesses. Instead the appellant merely argues that the record is "replete with examples of the trial court's failure to heed the clear mandate of the law."

The appellee argues that because of the failure of counsel to object to much of the trial judge's questions, the appellant has waived error, if any, resulting from the trial judge's conduct. The appellee does, however, acknowledge that this court on appeal may address all matters not objected to under the doctrine of "plain error."

■■■ In Syllabus Point 7 of *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996), this Court explained the application of the plain error doctrine, as follows:

An unpreserved error is deemed plain and affects substantial rights only if the reviewing court finds the lower court skewed the fundamental fairness or basic integrity of the proceedings in some major respect. In clear terms, the plain error rule should be exercised only to avoid a miscarriage of justice. The discretionary authority of this Court invoked by lesser errors should be exercised sparingly and should be reserved for the correction of those few errors that seriously affect the fairness, integrity, or public reputation of the judicial proceedings.

■■■ Syllabus Point 7 of *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995), also provides:

To trigger application of the "plain error" doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings.

Although counsel for the appellant failed to raise contemporaneous objections to the plethora of questioning by the judge or to his comments, we find the judge's role to be of such magnitude as to justify a review upon a plain error analysis. We find that Syllabus Point 7 of *LaRock, supra,* and Syllabus Point 7 of *Miller, supra,* are dispositive of this issue.

Finally, we examine whether the judge abandoned his role of impartiality and neutrality. We also examine whether the jurors were impressed with the trial judge's partiality to the point that the court's conduct became a factor in the determination of the jury such that the defendant did not receive a fair trial. We do not believe that it is necessary to pry into the mind of the trial judge or to speculate as to his motives in asking questions or making comments during the trial. We need only to view the judge's conduct from the perspective of the members of the jury.

With respect to Trooper Stevenson's testimony, the judge propounded approximately eighty-three questions, which, in large part, covered much of the areas already emphasized by the prosecuting attorney on direct examination. The questions were often duplicative and were of the same type which one would expect to be asked by the prosecuting attorney. The judge's questions covered matters such as the chain of custody and admissibility of the appellant's statement.

In his questions of Trooper Stevenson, the judge, on multiple times referred to the physical evidence collected by the police as a "meth lab," "methamphetamine," or "meth." We further observed from the record that on multiple occasions, both before the jury and at bench conferences, the trial judge prompted the prosecuting attorney on the proper areas of questioning needed to successfully introduce certain evidence with a witness. We believe, as a whole, the questioning of Trooper Stevenson betrayed to the jury that the trial judge had concluded that the physical evidence seized was in fact a clandestine drug lab, an ultimate question for the jury.

With respect to Lieutenant Goff, the trial judge propounded approximately twenty questions, some of which were specifically objected to by the appellant. We agree with the appellant's contention that the trial judge, as a result of the terminology used in his questions, once again betrayed to the jury that he had concluded that the appellant had been operating a clandestine drug laboratory. Furthermore, we believe that the nature of the questions, especially when coupled with the questioning of Trooper Stevenson, suggested to the jury that the trial judge had assumed the role of the prosecuting attorney.

We now turn to the judge's questioning of defense witnesses.

The judge propounded eleven questions to Kermit Sanford and forty-seven questions to Jesse Kay Thompson. *See infra.* While it is not possible to know the tone or demeanor of the trial judge during questioning, the language chosen by the judge often seemed to be an attempt to demean the credibility of those witnesses. The credibility of witnesses is also a question for jury determination.

The trial judge also propounded thirteen questions to Kristin Thompson, the appellant's wife. The questioning covered areas which were already covered by either the prosecuting attorney or defense counsel and did little more than to require the witness to rehash the bad behavior of the appellant in arguing with the witness and in discharging a gun. In his last two questions of this witness the judge twice asked if the fight between the defendant and the witness had anything to do with drugs, suggesting that the judge believed that the fight was, in fact, over some drug issue. We believe that the judge's line of questioning of Kristin Thompson also betrayed to the jury that the judge had formed a negative opinion of the appellant and that the judge had formed an opinion as to the appellant's guilt.

Finally, the trial judge propounded seven questions of the defendant Gerald Mark Thompson, Jr. The judge's questions related to the defendant's version of the events leading up to the defendant giving a statement to the police. We believe that these questions, though brief, betrayed to the

jury that the judge had formed a negative opinion of the appellant and that the judge did not believe the defendant's testimony surrounding the taking of the appellant's statement.

■ Therefore, we find that the judge in this case abandoned his role of impartiality and neutrality and that his role in both questioning witnesses and making comments to aid the prosecuting attorney in the presentation of the State's case seriously affected the fairness, integrity, and public reputation of the judicial proceedings. We also find that the judge's conduct in this case weighed in favor of the State's case to the point that the judge's partiality became a factor in the determination of the jury to such an extent that the appellant did not receive a fair trial.

The orderly conduct of criminal trials requires that the trial judge be extremely cautious not to intimate in any manner by word, tone, or demeanor, his opinion upon any fact in issue. Regardless of the intentions of the judge with his questioning of witnesses and prompting in this case, the actions of the judge in this case compel reversal.

We therefore reverse and remand this case on the on the appellant's second assignment of error that the trial judge erred through his extensive participation in the examination of witnesses and his providing guidance to the prosecuting attorney. After a review of the entire record of the trial, we conclude that the appellant did not receive a fair and impartial trial. We decline to address the appellant's other assignments of error.

## IV.

### Conclusion

We reverse and remand for a new trial.

Reversed and Remanded.