IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2025 Term

_____

No. 23-81

_____

FILED

**May 22, 2025**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent,

v.

CHAD M. ELDREDGE,
Defendant Below, Petitioner.

_____

Appeal from the Circuit Court of Fayette County, West Virginia
The Honorable Paul M. Blake, Jr., Judge
Case No. CC-10-2022-F-80

REVERSED AND REMANDED
_____

Submitted:  March 4, 2025
Filed:  May 22, 2025

Matthew Brummond, Esq.
Public Defender Services
Appellate Advocacy Division
Charleston, West Virginia
Counsel for Petitioner

John B. McCuskey, Jr., Esq.
Attorney General
Andrea Nease Proper, Esq.
Senior Assistant Attorney General
Charleston, West Virginia
Counsel for Respondent

CHIEF JUSTICE WOOTON delivered the Opinion of the Court.
JUSTICE ARMSTEAD and JUSTICE BUNN dissent and reserve the right to file
dissenting opinions.

SYLLABUS BY THE COURT

1.      "A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard."  Syl. Pt. 4, *State v. Rodoussakis*, 204 W. Va. 58, 511 S.E.2d 469 (1998).

2.      "A trial court must exercise its sound discretion when questioning a witness pursuant to Rule 614(b) of the West Virginia Rules of Evidence.  This Court will review a trial court's questioning of a witness under the abuse of discretion standard. To the extent the issue involves an interpretation of the Rule 614(b) as a matter of law, however, our review is plenary and de novo."  Syl. Pt. 1,  *State v. Farmer*, 200 W. Va. 507, 490 S.E.2d 326 (1997).

3.      "Rule 608(b) of the West Virginia Rules of Evidence limits the admissibility of evidence of specific instances of conduct for the purpose of attacking the credibility of a witness. Such evidence may not be proved extrinsically, but may be inquired into by cross-examination of the witness.  Furthermore, the evidence is admissible only if probative of truthfulness or untruthfulness."  Syl. Pt. 6, *State v. Murray*, 180 W. Va. 41, 375 S.E.2d 405 (1988).

4.      "The fact that a witness has been arrested or charged with a crime may be shown or inquired into where it would reasonably tend to show that his testimony might be influenced by interest or bias."  Syl. Pt. 4, *State v. Woods*, 155 W. Va. 344, 184 S.E.2d

i

130 (1971), *overruled on other grounds by State v. McAboy*, 160 W. Va. 497, 236 S.E.2d 431 (1977).

5.      "To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings."  Syl. Pt. 7, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

6.      "The plain language of Rule 614(b) of the West Virginia Rules of Evidence authorizes trial courts to question witnesses—provided that such questioning is done in an impartial manner so as to not prejudice the parties."  Syl. Pt. 3, *State v. Farmer*, 200 W. Va. 507, 490 S.E.2d 326 (1997).

7.      "Where a defendant on appeal in a criminal case asserts that a trial court's questioning of witnesses and comments prejudiced the defendant's right to present evidence and jeopardized the impartiality of the jury, this Court upon review will evaluate the entire record to determine whether the conduct of the trial has been such that jurors have been impressed with the trial judge's partiality to one side to the point that the judge's partiality became a factor in the determination of the jury so that the defendant did not receive a fair trial."  Syl. Pt. 3, *State v. Thompson*, 220 W. Va. 398, 647 S.E.2d 834 (2007).

8.	"A trial judge in a criminal case has a right to control the orderly process of a trial and may intervene into the trial process for such purpose, so long as such intervention does not operate to prejudice the defendant's case. With regard to evidence bearing on any material issue, including the credibility of witnesses, the trial judge should not intimate any opinion, as these matters are within the exclusive province of the jury." Syl. Pt. 4, *State v. Burton*, 163 W. Va. 40, 254 S.E.2d 129 (1979).

9.	"Assessments of harmless error are necessarily content-specific. Although erroneous evidentiary rulings alone do not lead to automatic reversal, a reviewing court is obligated to reverse where the improper exclusion of evidence places the underlying fairness of the entire trial in doubt or where the exclusion affected the substantial rights of a criminal defendant." Syl. Pt. 4, *State v. Blake*, 197 W. Va. 700, 478 S.E.2d 550 (1996).

WOOTON, Chief Justice:

Petitioner/defendant below, Chad M. Eldredge ("petitioner"), appeals his conviction of one count of second-degree sexual assault for which he was sentenced to ten to twenty-five years' imprisonment; he was acquitted of fourteen additional counts relating to other instances of sexual assault. Petitioner asserts that the trial court erred by posing questions to a defense witness that 1) inquired about pending criminal charges in violation of West Virginia Rule of Evidence 609; and 2) arguably sought to impeach her judgment and/or credibility in violation of West Virginia Rule of Evidence 614(b).

After careful review of the briefs of the parties, their oral arguments, the appendix record and the applicable law, we find that the trial court abused its discretion through its questioning of a defense witness, thereby improperly impugning her credibility and prejudicing petitioner. Accordingly, we reverse petitioner's conviction and remand for a new trial.

## I.    FACTS AND PROCEDURAL HISTORY

At the time of the underlying allegations petitioner was the stepfather of the victim, G.Y.,[1] who was ages twelve through seventeen during the events at issue. G.Y. was eighteen years old when she disclosed the underlying events to law enforcement. In

---

[1] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

May 2022, petitioner was indicted on seventeen counts stemming from the following: five specific instances of sexual assault of G.Y.,[2] one attempted sexual assault of G.Y., placing pornography on G.Y.'s computer, and exposing G.Y. to illegal substances in the home. Charges relating to the latter two incidents—one count of displaying obscene material and one count of gross child neglect—were dismissed by the trial court upon petitioner's motion for directed verdict and are not at issue in this appeal.[3]

Trial began on October 18, 2022. The State called three witnesses: the investigating officer, G.Y., and G.Y.'s then-boyfriend, now husband. The investigating officer testified generally about G.Y.'s reporting of the sexual assault allegations and introduced a recorded statement taken from petitioner. As pertained to the sexual assault allegations, G.Y.'s husband briefly testified to an incident where he observed petitioner pointing to his crotch while he was on a Facetime call with G.Y.

The State then called G.Y., who testified that shortly after petitioner moved into the family home he began inappropriately touching her by kissing her neck and touching her breasts and vagina. She testified generally that this conduct occurred on "multiple occasions," and conceded that she lacked details because it "happened so many

---

[2] Each of the alleged instances of sexual assault—except for one—gave rise to three separate charges: sexual assault in the second degree, sexual abuse by a parent or guardian, and incest. One alleged incident of sexual assault did not include an incest charge.

[3] As a result, testimony regarding these counts is not relevant to our discussion.

times that it just kinda like blends together all in one." Nonetheless, G.Y. testified to four separate incidents in varying degrees of additional detail, commensurate with some of the incidents specifically described in the indictment. G.Y. generally described one instance in which petitioner stuck his hand down her pants and touched her vagina and one instance in which he performed oral sex on her.

G.Y.'s testimony regarding the final two incidents was more detailed. With regard to the incident that comprised counts four through six of the indictment, G.Y. testified that petitioner entered her room with an erect penis, grabbed her ponytail, and inserted his penis into her mouth. She testified that she responded by pushing him against a dresser, which startled him presumably out of fear that he would awaken others in the home. With regard to the incident that comprised counts fifteen through seventeen of the indictment, G.Y. testified that petitioner used an orange sex toy on her; she testified that petitioner had previously given sex toys to her and placed them into her dresser drawer. She testified that, at the time of this incident, her brother was sleeping on the couch next to her and that petitioner stopped when her brother began to awaken.

After the State rested, petitioner testified on his own behalf, denying all of the allegations; he contended that G.Y. concocted the allegations as retribution for petitioner criticizing G.Y.'s then-boyfriend and her mother's refusal to allow him to move into the family home. Petitioner claimed that G.Y. had once previously made similar allegations against him after she was suspended from school and subjected to additional

3

chores at home, but equivocated and did not mention the matters further after her punishment was mitigated. Petitioner also called G.Y.'s younger brother as a defense witness; he briefly testified that, shortly before petitioner moved out of the house, G.Y. remarked: "[D]on't worry [petitioner] will be out of the house soon."

Petitioner's final witness was G.Y.'s mother, R.E., from whom he was divorced in 2021.[4] R.E. testified that G.Y. had once previously alleged that petitioner was "messing with" her and agreed with petitioner's contention that the allegations were an attempt to mitigate her punishment after being suspended from school. R.E. testified that G.Y. could not or would not provide any specifics about her allegations at that time; a couple of days later, after pressing her for greater detail, R.E. testified that G.Y. stated: "I don't know why I said that." R.E. testified that when G.Y. raised the instant accusations against petitioner, R.E. had recently told her that she needed to "take some time off from seeing her boyfriend" and refused to let him move into the house. Contrary to G.Y.'s testimony, R.E. testified that it was her—and not petitioner—who had provided the sex toys to G.Y. R.E. testified that G.Y. had become curious about her sexuality, and she provided two vibrators to her so that she "wouldn't be off doing it with the boys."

---

[4] Testimony indicated that G.Y. obtained a domestic violence protective order against petitioner in February 2021, prompting him to eventually move out of the house. She testified that petitioner nonetheless continued to come to the house, causing her to move out in April 2021. Petitioner and R.E. were divorced in September 2021.

During the State's cross-examination of R.E., she admitted that she and petitioner remained friends despite the allegations and following their divorce, and that she funded a jail telephone account which enabled petitioner to contact her. Upon the State inquiring about the account, petitioner's counsel objected to relevance, which objection the trial court initially sustained. The State then asked to approach and advised the court that R.E. had "pending charges for fraud" for using her sister's credit card to fund the jail account. Petitioner's counsel argued that the evidence was not relevant and "hasn't been adjudicated." The State argued that the evidence showed "bias and motive" and, as a fraud charge, went to R.E.'s truthfulness. The court stated, "I think that goes to credibility[,]" and overruled the objection. Upon returning to open court, the trial court immediately directed the State to "ask the question *about whether she's been charged*." (Emphasis added).

In response to that directive, however, the State inquired only into the underlying conduct, i.e. whether R.E. had used her sister's credit card to fund petitioner's jail account. R.E. admitted to the conduct but claimed it was accidental; she testified that she had used the card once with her sister's permission and the next time she went to place funds into the jail account, she simply failed to input new credit card information. At the end of this questioning, the following exchange occurred:

> The court:　Ma'am, do you presently have charges pending against you for fraudulently using—
>
> R.E.:　Yes, I do.

5

> The court: —a credit card belonging to this woman?
>
> R.E.: Yes, I do.
>
> The court: All right, the answer to that question is, yes. Go ahead.

At the conclusion of R.E.'s testimony, the court interjected again:

> The court: Ma'am, let me ask you this question, you've testified that you gave your daughter, who was 15 or 16 years of age, two vibrators. What did you intend for her to do with those two vibrators? Did you—?
>
> R.E.: She was curious about her sexuality, to explore it, that way instead of going out and trying to do it with—.
>
> The court: So, did you intend for her to use the vibrators on herself?
>
> R.E.: If she wanted to.
>
> The court: All right, did you demonstrate to her [how] to use those vibrators?
>
> R.E.: No.
>
> The court: Did you discuss that with the Defendant?
>
> R.E.: No.
>
> The court: Why did you think that was a good idea?
>
> R.E.: Because I'd rather her do it with that than go out and do it with some boy.

During closing, the prosecutor referenced both of these pieces of testimony, arguing that

R.E. was not credible as a result:

> Or we can believe [R.E.]. . . . [She's] [s]uch a good mom that she no longer has a relationship with her daughter because she's chosen to believe a perpetrator instead. The mother who

6

gave her teenage daughter sex toys. Mother who has pending felony charges for using her sister's credit card to put money on her ex-husband's jail account, so that they could still talk while he was in jail for molesting her daughter.

During deliberations, the jury indicated it was deadlocked on one count; after receiving an *Allen* charge[5] and further deliberation, the jury found petitioner not guilty on all counts except count four: second degree sexual abuse, involving the incident where petitioner placed his penis in G.Y.'s mouth. However, the jury found petitioner not guilty of two additional counts—counts five (incest) and six (sexual abuse by parent/guardian)—relating to that same incident. The trial court subsequently sentenced petitioner to ten to twenty-five years' imprisonment and this appeal followed.

## II.    STANDARD OF REVIEW

"A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. Pt. 4, *State v. Rodoussakis*, 204 W. Va. 58, 511 S.E.2d 469 (1998). Further, "[t]his Court will review a trial court's questioning of a witness under the abuse of discretion standard." Syl. Pt. 1, in

---

[5] As we explained in *State v. Waldron*, 218 W. Va. 450, 459 n.11, 624 S.E.2d 887, 896 n.11 (2005): "'The *Allen* charge . . . is a supplemental instruction given to encourage deadlocked juries to reach agreement.' The name for this particular instruction originated from the case of *Allen v. United States*, 164 U. S. 492, 17 S. Ct. 154, 41 L.Ed. 528 (1896)." (citation omitted).

part, *State v. Farmer*, 200 W. Va. 507, 490 S.E.2d 326 (1997). Under this standard of review, we proceed to petitioner's arguments.

## III. DISCUSSION

Petitioner assigns two separate errors to the trial court's questioning of R.E. He argues that by eliciting evidence of R.E.'s pending criminal charges for which there had been no conviction, the trial court violated West Virginia Rule of Evidence 609. He further argues that the trial court's examination of R.E. about providing the vibrators to G.Y. violated West Virginia Rule of Evidence 614(b), which prohibits prejudicial examination of a witness by the trial court. While urging generally that the circuit court's inquiries were within the bounds authorized by the Rules of Evidence, the State further argues that petitioner's acquittal of all but one charge renders any alleged error harmless.

A. *EVIDENCE OF R.E.'S PENDING CRIMINAL CHARGES*

Petitioner first argues that by eliciting evidence of R.E.'s unadjudicated criminal charges, the trial court violated Rule 609 which makes evidence of certain convictions admissible for impeachment purposes. Petitioner asserts this error was even more egregious because the State did not elicit this inadmissible evidence—the trial court did. In response, the State concedes that the charges did not constitute a conviction admissible under Rule 609; instead, it argues that the "line of questioning" regarding R.E.'s alleged unauthorized use of her sister's credit card was either authorized by Rule 608 or constituted generally admissible evidence of bias.

8

We begin by making an important distinction regarding the evidence below and the error advanced on appeal. Petitioner concedes that R.E.'s *conduct*, i.e. allegedly unauthorized use of her sister's credit card to maintain contact with petitioner, was admissible evidence, but the fact that she was charged with a crime as a result of that conduct was not. The State's response largely blurs this distinction and casts its argument in broad strokes regarding general principles applicable to cross-examination and impeachment to discern evidence regarding "credibility and bias." However, the precise issue before the Court is whether evidence of pending criminal charges against a defense witness is authorized impeachment under the Rules of Evidence or otherwise.

1.    *RULES 609 AND 608*

As indicated, the State concedes petitioner's primary argument: that Rule 609—entitled "Impeachment by Evidence of a Criminal Conviction"—provides no authority for impeachment of a witness with evidence of mere criminal charges. We agree. Rule 609 provides,

> For the purpose of attacking the credibility of a witness other than the accused
>
> (A) evidence that the witness has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and
>
> (B) evidence that the witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment.

9

W. Va. R. Evid. 609(a)(2)(A) and (B). Plainly, Rule 609 provides no authority for the introduction of "criminal process" short of the convictions and under the circumstances described in the Rule.

We turn then to the State's contention that the criminal charges were admissible under Rule 608. Rule 608—virtually identical in substance to Federal Rule of Evidence 608—provides that a witness's "character for truthfulness or untruthfulness" may be attacked, under certain circumstances, by two methods: 1) reputation or opinion evidence; or 2) specific instances of conduct. As to the latter, subsection (b) of the Rule provides:

> *Specific instances of conduct*.—Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination of a witness other than the accused, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:
>
> (1) the witness; or
>
> (2) another witness whose character the witness being cross-examined has testified about.

W. Va. R. Evid. 608(b); *see also* Syl. Pt. 6, *State v. Murray*, 180 W. Va. 41, 375 S.E.2d 405 (1988) ("Rule 608(b) of the West Virginia Rules of Evidence limits the admissibility of evidence of specific instances of conduct for the purpose of attacking the credibility of a witness. Such evidence may not be proved extrinsically, but may be inquired into by

10

cross-examination of the witness.  Furthermore, the evidence is admissible only if probative of truthfulness or untruthfulness.").

Again, however, the State's oblique insistence that Rule 608 sanctions the entire "line of questioning" regarding R.E.'s use of her sister's credit card to fund petitioner's jail account improperly conflates her conduct with the resultant charges.  As petitioner concedes, the State was "free to cross-examine [R.E.] concerning her unauthorized credit card use" pursuant to Rule 608(b) as a specific instance of conduct going to her "character for truthfulness."  However, criminal charges are not a "specific instance[] of conduct."  Moreover, commentators to the federal rule have warned against attempting to "piggy-back" the *consequences* of admissible 608(b) conduct into evidence:

> Cross-examination as to a specific instance relating to the character for untruthfulness . . . should be phrased in terms of the *underlying act itself. . . .* [T]he question *should not inquire about rumors, reports, arrests or indictments* but rather about the underlying specific act of misconduct itself. The *act of misconduct alone is relevant* when cross-examining the alleged actor, not whether someone else might think that the witness committed the act.

Michael H. Graham, 4 Handbook of Fed. Evid. § 608:4 (9th ed., Nov. 2024) (footnotes omitted) (emphasis added).  The 2003 Advisory Committee Note to the Federal rule indicates the same:  "It should be noted that the extrinsic evidence prohibition of Rule 608(b) bars any reference to the consequences that a witness might have suffered as a result of an alleged bad act.'"  Fed. R. Evid. 608(b), advisory committee note.  Federal courts agree:  "Cross-examination about specific instances of conduct should be limited to an

11

elicitation of the basic facts." *United States v. Dennis*, 625 F.2d 782, 799 (8th Cir. 1980).

In fact, specific to criminal charges, the Fifth Circuit has expressly held that such evidence

does not constitute proper Rule 608(b) impeachment: "[I]nquiry into the mere existence

of an arrest or indictment is not admissible to impeach the defendant's credibility under

Fed. R. Evid. 608(b)." *United States v. Abadie*, 879 F.2d 1260, 1267 (5th Cir. 1989)

(footnote omitted).  Accordingly, we find that Rule 608 likewise provides no authority for

the trial court's inquiry into the existence of criminal charges against R.E.

### 2.    *THE BIAS EXCEPTION*

Consistent with its argument below, however, the State's final argument

sharpens its focus, contending that this issue is not controlled by the Rules of Evidence at

all because the charges were demonstrative of R.E.'s bias.[6]  In support, the State cites the

Fourth Circuit's observation that

> [t]he distinction between impeachment evidence proving bias
> and impeachment of general credibility is important because
> generally applicable evidentiary rules limit inquiry into
> specific instances of conduct through the use of extrinsic
> evidence and through cross-examination with respect to
> general credibility attacks, but no such limit applies to
> credibility attacks based upon motive or bias.

---

[6] The State argues that R.E.'s criminal charges evidenced bias not only through the continued relationship between her and petitioner, but the *extent* of such bias, i.e. that R.E. not only endeavored to maintain contact with petitioner but would go so far as to act fraudulently to do so.  *Cf. United States v. Abel*, 469 U.S. 45, 46 (1984) (witness's gang membership bore not only on "fact of bias but also on the *source* and *strength* of [witness's] bias.").

12

*Quinn v. Haynes*, 234 F.3d 837, 845 (4th Cir. 2000) (citations omitted) (footnote omitted).

The United States Supreme Court first observed the Rules' silence on bias impeachment as opposed to the impeachment evidence explicitly sanctioned by Rules 608 and 609: "[T]he Rules do not by their terms deal with impeachment for 'bias,' although they do expressly treat impeachment by character evidence and conduct, Rule 608, by evidence of conviction of a crime, Rule 609[.]" *Abel*, 469 U.S. at 49; *accord United States v. Rios Ruiz*, 579 F.2d 670, 673 (1st Cir. 1978) ("The 'bias' exception to the strictures of Federal Rules of Evidence 608(b) and 609(a) has been generally recognized."). The Advisory Committee Notes to the Federal Rule likewise indicate that instances of conduct going to general "truthfulness" fall within the Rules but "[e]vidence of bias or interest does not." Fed. R. Evid. 608, advisory committee note; *see also Beck v. State*, 824 P.2d 385, 388 (Okla. Crim. 1991) ("Although evidence that impeaches a witness for bias is routinely admitted, it is not regulated by any provision of the Evidence Code. However, in practice, this type of evidence is permitted under common law principles."); *State v. Hackford*, 737 P.2d 200, 203 (Utah 1987) ("[I]f a prior instance of conduct is relevant to a witness' bias or motive to testify differently than would otherwise be the case, evidence pertaining to that conduct is not subject to exclusion under Rule 608(b).").

With respect to criminal charges, this evidence has most commonly been permitted against *prosecution* witnesses as a necessary predicate to demonstrating bias or motive in exchange for prosecutorial leniency. *See People v. Reynolds-Wynn*, 551 P.3d

1211, 1217 (Col. App. 2024) (permitting evidence of pending charges for bias or motive where testimony "'might be influenced by a promise of, or hope or expectation of, immunity or leniency with respect to . . . pending charges against [the witness], as a consideration for testifying against the defendant.'" (quoting *People v. King*, 498 P.2d 1142, 1144-45 (Col. 1972))).[7]

This Court has embraced the same approach. Before the adoption of the Rules of Evidence, this Court held that "[t]he fact that a witness has been arrested or charged with a crime may be shown or inquired into where it would reasonably tend to show that his testimony might be influenced by interest or bias." Syl. Pt. 4, *State v. Woods*, 155 W. Va. 344, 184 S.E.2d 130 (1971), *overruled on other grounds by State v. McAboy*,

---

[7] Permitting criminal defendants ample leeway to cross-examine on issues of bias has been heavily influenced by the observation that "the right to cross-examine to expose a prosecution witness's bias has a constitutional dimension." 1 McCormick on Evid. § 39, (9th ed. Feb. 2025) (discussing bias and partiality); *see Davis v. Alaska*, 415 U.S. 308, 316-17 (1974) ("[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination."); *Billodeau v. State*, 277 S.W.3d 34, 40 (Tex. Crim. App. 2009) ("[T]he Confrontation Clause of the Sixth Amendment may require admission of evidence that Rule 608(b) would otherwise bar.").

Further, prosecutorial leniency is but the most common basis upon which evidence of criminal charges has been permitted as evidence of bias or motive; it is not the exclusive basis upon which this evidence has been found probative of bias or motive. *See, e.g., People v. Yarbrough*, 454 N.W.2d 419 (Mich. Ct. App. 1990) (allowing evidence of pending charges as demonstrative of motive to testify falsely because witness's charges relate to underlying crime). Conversely—and pertinent to the instant case—admission under a theory of anti-prosecution bias resulting from criminal charges has typically been disallowed as it would open the door entirely to admission of any and all criminal charges. *See, e.g., People v. Hughes*, 522 N.E.2d 1275, 1278-79 (Ill. App. Ct. 1988) ("[A]nti-prosecution antagonism resulting solely from the pendency of criminal charges is insufficient to allow impeachment of a defense witness by introduction of those charges.").

14

160 W. Va. 497, 236 S.E.2d 431 (1977).  Consonant with the Supreme Court's observation that the Rules do not address bias impeachment, we continued to endorse such evidence even after our adoption of the Rules.  *See State v. Eye*, 177 W. Va. 671, 674, 355 S.E.2d 921, 924 (1987) (finding prohibition of defendant's cross-examination of State witness about dismissed charges in exchange for interview about subject crime violated defendant's right of confrontation); *State v. Hoard*, 180 W. Va. 111, 113, 375 S.E.2d 582, 584 (1988) (finding exclusion of evidence of pending charges against government witness stripped defendant of the opportunity to show "bias proceeding from expected prosecutorial favor.").

Importantly, however, in these cases it is the *fact* that a witness has pending criminal charges that establishes the bias, as opposed to the underlying conduct.  And courts nationwide have been careful to contrast Rule 609's "general rule" that "only evidence of a witness's prior *convictions* may be admitted for impeachment purposes[]" with the well-established "right to cross-examine a witness concerning pending criminal charges . . . for purposes of exposing a witness' motivation in testifying, e.g., bias, partiality, or agreement between the government and the witness[.]"  *Willis v. State*, 728 S.E.2d 857, 866 (Ga. Ct. App. 2012); *see also Jones v. State*, 595 S.E.2d 595, 596 (Ga. Ct. App. 2004) ("While a defendant is entitled to cross-examine a witness about pending charges in order to address any bias the witness may have *as a result of those pending charges*, she may not use such charges to impeach the witness unless the misconduct has resulted in the conviction of a crime of moral turpitude." (emphasis added)).

15

Our decision in *State v. Williams,* 236 W. Va. 130, 778 S.E.2d 579 (2015), is instructive. In *Williams*, we found no error where the trial court refused to permit defendant to cross-examine a witness about her entry into and completion of a pretrial diversion agreement which resulted in the dismissal of charges. *Id.* at 138, 778 S.E.2d at 587. As to the governance of Rule 609, the *Williams* Court agreed with the trial court's conclusion that Rule 609 provided no entryway for admissibility "[b]ecause there is no dispute that [the witness] was not convicted of a crime[.]" *Id.* at 137, 778 S.E.2d at 586. As to the defendant's claim that the evidence was demonstrative of bias, the Court explained that the witness's pretrial diversion agreement was entered into and discharged at the time she was questioned by police. *Id.* at 137-38, 778 S.E.2d at 586-87. The Court therefore concluded that there was "no factual basis" upon which to assert that the witness was "pressured or induced . . . into giving a statement to 'get in good with the police' *because of* her pretrial diversion agreement." *Id.* at 136-38, 778 S.E.2d at 585-87 (emphasis added). This resolution comports with our prior admonition that "[c]ross-examination as to prior arrests of a witness who is not the defendant is ordinarily not permitted." *State v. Gangwer*, 168 W. Va. 190, 199 n.7, 283 S.E.2d 839, 844 n.7 (1981).[8]

---

[8] The reason for this rule is patent: "An indictment is merely an accusation and no evidence of guilt. Such evidence can have no other effect than to prejudice the accused's case in the eyes of the jury, and all attempts to bring such facts before the jury merit the strongest condemnation by the courts." *State v. Cobb*, 122 W. Va. 97, ___, 7 S.E.2d 443, 445 (1940); *see also State v. Price*, 113 W. Va. 326, 167 S.E. 862, 866 (1933) ("Mere accusation should carry no stigma. One is presumed to be innocent until his guilt is proved. That postulate of the law is not a mere hollow form or deceitful phrase. It is one of the (continued . . .)

16

These cases provide useful contrast and demonstrate why R.E.'s criminal charges were not admissible under the bias exception. R.E. was a defense witness who readily admitted the *conduct* which demonstrated bias—that she funded petitioner's jail account for purposes of maintaining contact and went so far as to use her sister's credit card, allegedly without permission, to do so. Testifying against the State could not conceivably curry prosecutorial favor as pertained to her own charges and the State articulates no differing or added dimension the criminal charges lend to the evidence of potential bias apparent from the underlying conduct. Like *Williams*, there is no factual basis connecting R.E.'s charges with any bias or motive to testify falsely. Simply put, it is R.E.'s conduct that demonstrated potential bias—not the fact that she was criminally charged as a result. *See United States v. Whitmore*, 359 F.3d 609, 621 (D.C. Cir. 2004) (contrasting exclusion of cross-examination of witness about the filing of a civil complaint against the witness with "cross-examin[ing] the witness about the *substance* of the complaint."); *Hafner v. Brown*, 983 F.2d 570, 576 (4th Cir. 1992) (citing Fed. R. Evid. 608(b) and 609(a) as supporting trial court's proper exclusion of arrests due to "general prohibition against introducing past arrests not leading to conviction[]" where party permitted to "ask the witness directly" about bias); *Dennis*, 625 F.2d at 798 (concluding

---

basic guarantees of American citizenship and must be treated as such."). These cases echo the United States Supreme Court's rationale for allowing impeachment by conviction, as opposed to a mere charge or arrest: "Arrest without more does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness. It happens to the innocent as well as the guilty. Only a conviction, therefore, may be inquired about to undermine the trustworthiness of a witness." *Michelson v. United States*, 335 U.S. 469, 482 (1948).

17

"Rule 608(b) would permit inquiry into the specific acts that may have led to the arrest if those acts related to crimen falsi, e.g., perjury, subornation of perjury, false statement, embezzlement, false pretenses[]" but "cross-examination about arrests without convictions is precluded[.]").

Therefore, because the evidence of R.E.'s criminal charges was neither a conviction authorized by Rule 609, a specific instance of conduct under Rule 608(b), nor itself evidence of bias—and the State offers no alternate ground for its admissibility—that evidence was erroneously injected by the trial court. However, before addressing the State's contention that this error was harmless, we find it expedient to first address petitioner's second—and related—assignment of error regarding the remainder of the trial court's questioning of R.E.

B.    *TRIAL COURT'S EXAMINATION OF R.E.*

Because petitioner did not object below, he asserts that the trial court's questioning of R.E. about the vibrators was plain error violative of Rule 614(b). Petitioner argues that, while a trial court is permitted to question witnesses, the series of questions the trial court posed to R.E. constituted a prejudicial attempt to impeach her credibility and/or judgment—an "inherently partisan" act by which the trial court signaled its disbelief that she provided the vibrators to G.Y. We are mindful that the plain error doctrine requires the Court to find that there was "(1) an error; (2) that is plain; (3) that affects substantial

18

rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, in part, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

The State counters that the trial court's questions were merely clarifying and well within the type of questioning permitted under West Virginia Rule of Evidence 614(b). Distinguishing cases where such inquiry resulted in reversal, the State insists that the trial court's relatively few questions were insufficient to constitute a prejudicial examination of a witness.

West Virginia Rule of Evidence 614(b) provides that "[t]he court may examine a witness regardless of who calls the witness. In jury trials the court's examination shall be impartial so as not to prejudice the parties." *See also* Syl. Pt. 3, *State v. Farmer*, 200 W. Va. 507, 490 S.E.2d 326 (1997) ("The plain language of Rule 614(b) of the West Virginia Rules of Evidence authorizes trial courts to question witnesses—provided that such questioning is done in an impartial manner so as to not prejudice the parties."). Even before the Rules of Evidence were adopted, the Court has repeatedly held that, "[w]ith regard to evidence bearing on any material issue, *including the credibility of witnesses*, the trial judge should not intimate any opinion, as these matters are within the exclusive province of the jury." Syl. Pt. 4, in part, *State v. Burton*, 163 W.Va. 40, 254 S.E.2d 129 (1979) (emphasis added); *see also State v. Bennett*, 172 W. Va. 131, 133, 304 S.E.2d 35, 38 (1983) ("This Court has consistently held that it is highly improper for a trial judge to comment upon the weight of evidence or the credibility of witnesses, or to indicate in any

19

manner that he is a partisan for either side."); Syl. Pt. 1, in part, *Dye v. Rathbone*, 102 W.

Va. 386, 135 S.E. 274 (1926) ("The judge of the court when engaged in the trial of a case

before a jury should studiously abstain from indicating by word, gesture or otherwise his

personal views upon the weight of the evidence, or the credibility or incredibility of the

witnesses[.]"); Syl. Pt. 7, in part, *State v. Austin*, 93 W. Va. 704, 117 S.E. 607 (1923) ("In

the trial of a criminal case . . . the court should be extremely cautious not to intimate in any

manner, by word, tone, or demeanor, his opinion upon any fact in issue.").

Therefore, for purposes of evaluating such an alleged error, we have

instructed:

> Where a defendant on appeal in a criminal case asserts
> that a trial court's questioning of witnesses and comments
> prejudiced the defendant's right to present evidence and
> jeopardized the impartiality of the jury, this Court upon review
> will evaluate the entire record to determine whether the
> conduct of the trial has been such that jurors have been
> impressed with the trial judge's partiality to one side to the
> point that the judge's partiality became a factor in the
> determination of the jury so that the defendant did not receive
> a fair trial.

Syl. Pt. 3, *State v. Thompson*, 220 W. Va. 398, 647 S.E.2d 834 (2007). The trial transcript

reveals that G.Y. claimed petitioner gave her the vibrators despite her outright refusal of

them. R.E. staunchly and clearly refuted this testimony, claiming to have given the

vibrators to G.Y. herself to address G.Y.'s sexual curiosity. Upon review of the trial court's

independent inquiry into this issue, we cannot conclude that the whole of its questions were

clarifying on this point in any way; to the contrary, the trial court's questions rehashed

20

testimony already given with the effect of expressing disapproval of R.E.'s parental judgment and/or credibility.[9]

The trial court first asked whether R.E. intended G.Y. to use the vibrators on herself—a matter which she had already addressed on direct examination by explaining that she provided them so that G. Y. "wouldn't be off doing it with the boys." Next, the trial court inquired whether R.E. demonstrated how to use them—an inquiry which, at best, is simply not germane. The trial court's final inquiry asked R.E. why she thought it was a "good idea" to provide the vibrators to G.Y.; at this point, R.E. had already *twice* testified to her reasoning for doing so. *See Bennett*, 172 W. Va. at 134, 304 S.E.2d at 38 (finding judge's questions constituted reversible error where "[t]here was nothing in [the witness's] testimony . . . that needed clarification."); *Thompson*, 220 W. Va. at 403, 647 S.E.2d at 839 (finding plain error where judge's questioning "covered much of the testimony previously covered by the prosecuting attorney on direct examination."). In an effort to brand the interrogation as inconsequential, even the State concedes that R.E.'s responses to these questions had been "already elicited" by the prosecutor.

We find that the trial court's questions had the effect of making R.E. appear unscrupulous or untrustworthy. And while the State focuses on the limited number of

[9] At best, the trial court's inquiry about whether R.E. had discussed giving G.Y. the vibrators with petitioner is an arguably clarifying question. However, this lone clarification does not mitigate the effect of the trial court's remaining questions.

questions posed, a prejudice inquiry is not confined to the degree of intrusion by the trial court's questioning, but rather the impact. Indeed, syllabus point three of *Thompson* requires the Court to examine the questioning in light of the "entire record." *Id.*, 220 W. Va. at 400, 647 S.E.2d at 836, in part. The questions, phrased in a tone of incredulity, specifically expressed doubt and/or disapproval of R.E.'s claim that she, and not petitioner, gave G.Y. the vibrators, and of her parental judgment. Whether these questions reflected partiality or were an inadvertent indulgence of the trial court's own curiosity or surprise is of no moment. These questions clarified nothing and, as petitioner argues, expressed to the jury both "moral condemnation" and suspicion about R.E.'s testimony.[10] We therefore find that the trial court's examination of R.E. was erroneous and proceed now to our analysis of the effect of that error on the trial as a whole.

## C.    HARMLESS ERROR

As to both of petitioner's assignments of error, the State claims that any error was harmless, relying heavily on petitioner's acquittal on all but one count of the seventeen-count indictment. Petitioner counters that the case was entirely about credibility and any error impacting the credibility of petitioner's most "crucial" witness—the victim's mother who "contradict[ed] her own daughter's accusation"—is necessarily prejudicial. Petitioner emphasizes that the improper injection of R.E.'s criminal charges by the trial

---

[10] *Accord Thompson*, 220 W. Va. at 411, 647 S.E.2d at 847 ("We do not believe that it is necessary to pry into the mind of the trial judge or to speculate as to his motives in asking questions or making comments during the trial. We need only to view the judge's conduct from the perspective of the members of the jury.").

court itself only exacerbates the prejudice and further demonstrates the trial court's partiality against petitioner as evidenced in its own questioning of R.E. Petitioner further suggests the jury's initial disclosure that they were deadlocked, followed by a compromise verdict—wherein the jury convicted petitioner of only one of three crimes associated with the incident—is evidence that the jury's verdict was influenced entirely by witness credibility.

Ordinarily, our test for harmless error requires us to determine whether, after removal of any inadmissible evidence, the remaining evidence is sufficient to sustain the verdict. Syl. Pt. 2, *State v. Atkins*, 163 W. Va. 502, 261 S.E.2d 55 (1979). However, since the errors at issue are based only partially on the introduction of inadmissible evidence but also the trial court's improper questioning of a witness, a more general analysis of whether the errors had any "prejudicial effect" on the jury is more appropriate. *Id.* Syllabus point four of *State v. Blake*, 197 W. Va. 700, 478 S.E.2d 550 (1996) instructs that

> [a]ssessments of harmless error are necessarily content-specific. Although erroneous evidentiary rulings alone do not lead to automatic reversal, a reviewing court is obligated to reverse where the improper exclusion of evidence places the underlying fairness of the entire trial in doubt or where the exclusion affected the substantial rights of a criminal defendant.

For all practical purposes, this inquiry equally informs the issue whether petitioner has established plain error in regard to his second assignment of error. *See Miller*, 194 W. Va. at 7, 459 S.E.2d at 118, Syl. Pts. 7 & 9, in part (requiring a showing of plain error which affects "substantial rights" which "means the error was prejudicial.").

23

To that end, in the context of whether a trial court's questioning requires reversal, we have previously directed our analysis more specifically to whether the trial court "abandoned [its] role of impartiality and neutrality[] . . . [and] whether the jurors were impressed with the trial judge's partiality to the point that the court's conduct became a factor in the determination of the jury such that the defendant did not receive a fair trial." *Thompson*, 220 W. Va. at 411, 647 S.E.2d at 847. Given the trial court's considerable influence over a jury, this Court has stated that "[a]n intimation of [the trial judge's] opinion on a material fact in issue will constitute reversible error." *Bennett*, 172 W. Va. at 133, 304 S.E.2d at 38.

We acknowledge the superficial appeal of the State's contention that because R.E.'s testimony did not address the only incident for which he was convicted, her credibility did not impact the outcome of the trial. But the State goes further, emphasizing that petitioner was *acquitted* of the only charge for which R.E. had any material information to offer, i.e. the incident involving the vibrators; therefore, the jury must have found her credible. Contrary to the State's insinuation, however, R.E. did not testify as to the vibrator incident itself—or any specific incident for that matter.[11]

---

[11] In this regard, we take issue with the State's characterization of the testimony in support of each charge. First, the State incorrectly maintains that the lone charge for which petitioner was convicted was supported by another witness—G.Y.'s husband—therefore the conviction was not premised on the competing credibility of G.Y. and R.E. To the contrary, G.Y.'s husband offered no testimony regarding any of the specific incidents (continued . . .)

Instead, R.E.'s testimony was offered to challenge G.Y.'s credibility in general and her allegations on the whole, rather than her account of any specific incident. R.E.'s testimony was introduced for the purpose of proving that G.Y. was motivated to make these allegations out of spite and perceived mistreatment at home—just as she had allegedly done once before. R.E. was petitioner's capstone witness—the mother of the alleged victim, who notably sided with the accused. R.E.'s credibility was paramount to petitioner's case; in fact, the State itself during closing arguments noted that these type of cases "always . . . come down to who you believe[]" and reminded the jurors that during voir dire, none of them balked at the possibility of convicting "based on just the victim's word."

Therefore, but for the trial court impermissibly damaging her credibility through its partisan questioning and injection of inadmissible evidence of criminal charges pending against her, the jury may have believed the upshot of R.E.'s testimony—that G.Y. fabricated *all* of these allegations—and acquitted petitioner of all charges. When examining the effect of errors on a defendant's defense in its entirety, the Court has observed that if "the error precludes or impairs the presentation of a defendant's best means of a defense, we will usually find the error had a substantial and injurious effect on the

---

described by G.Y. Moreover, the State's suggestion that R.E.'s testimony—and presumed credibility—about providing the vibrators lent itself to petitioner's acquittal on that charge is equally tenuous. G.Y. testified that this specific incident occurred on a couch also occupied by her sleeping brother—a fact far more pertinent to the veracity of this incident than who had provided the vibrators to G.Y.

25

jury. When the harmlessness of the error is in grave doubt, relief must be granted." *Blake*, 197 W. Va. at 705, 478 S.E.2d at 555. We further specified that evidentiary error may not be harmless where it impacts "not only . . . general credibility of [a] witness" but a party's "best and most effective evidence." *Id.* at 710, 478 S.E.2d at 560; *see also United States v. Pennix*, 313 F.2d 524, 531 (4th Cir. 1963) (finding that where "primary issue[] for jury determination was the conflict [between witnesses] . . . . any error which reflected upon or tended to impeach . . . credibility" is not "insubstantial"); *Fulton v. State*, 335 So. 2d 280, 285 (Fla. 1976) (rejecting harmless error where "improper discrediting of a defense witness' testimony" with pending criminal charges "went to the heart" of defendant's defense).

Moreover, we cannot discount the fact that the testimony regarding R.E.'s criminal charges and prejudicial attack on her credibility was not occasioned by the State, but by the trial court itself. Juries are quickly conditioned to the use of impeachment and cross-examination by the parties' attorneys and learn to view evidence elicited by the attorneys with appropriate skepticism, as part of its understanding of the attorneys' required advocacy. In this case, the *trial court* chose to depart from its impartial, managerial role and *twice* insinuate itself into the examination of a witness for the sole purpose of affirmatively eliciting damaging evidence about that witness. In fact, the trial court only

inquired of R.E. regarding the criminal charges after the State wisely declined its express direction to do so.[12]

Accordingly, we find the fact that this discrediting evidence was elicited by the trial court heightened its prejudicial impact. As a result, the evidence bore the court's imprimatur that R.E. was not credible, exercised poor parental judgment, and was a criminal—all information the trial court plainly believed to be necessary and important for the jury's consideration. We therefore reject the State's contention that the evidentiary errors assigned by petitioner were harmless, reverse petitioner's conviction, and remand for a new trial.

## IV.    CONCLUSION

For the reasons set forth above, we reverse the January 24, 2023, sentencing order of the Circuit Court of Fayette County, West Virginia, and remand for a new trial.

Reversed and remanded.

---

[12] With the introduction of this evidence, the jury was effectively informed that the government believed R.E. acted criminally with respect to use of her sister's credit card and that her explanation was untrue. As the Third Circuit observed in the context of Rule 608(b) evidence, "[a]llowing such a line of questioning not only puts hearsay statements before the jury, it injects the views of a third person into the case to contradict the witness." *United States v. Davis*, 183 F.3d 231, 257 n.12 (3d Cir. 1999), *amended by* 197 F.3d 662 (3d Cir. 1999).